AO 91 (Rev. 11/11) Criminal Complaint

**United States Courts
Southern District of Texas
FILED**

JUN 2 7 2013

David J. Bradley, Clerk of Court

# UNITED STATES DISTRICT COURT

06/26/13

for the

Western District of Texas

Clerk, U. S. District Court
Western District of Texas

By _____
Deputy

|  |  |
|---|---|
| United States of America | ) |
| v. | ) |
| Muhammad JAFFER ALI(1), Ashekul MOWLA(2), Ashak WESA a.k.a. Antonio(3), David B. PUCEK(4), Dung NGUYEN a.k.a. Alex(5), Brian ARTHUR(6), R. DAN ARTHUR(7), Joshua Louis HASNESS(8), Amir Nabil Shaker SENADA(9), Salma JAFFER ALI(10), Faizan ALI(11), Luz Abril GARCIA(12), Irma ZERTUCHE-Santillan(13), Gulzar DHARANI(14), Abu Mohammad Mafttah UDDIN(15), Syed ALI(16), Yong CHONG(17), Derrick SANTILLAN(18), Prasanta BARDHAN(19) DEFENDANT(s) | ) ) ) ) ) ) ) ) ) ) ) ) |

Case No.    5:13-MJ-578

H·13·647m

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of ____January 10, 2012____ in the county of ____Bexar____ in the ____Western____ District of ____Texas____,
the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 846 and 841(a) | Conspiracy to Manufacture, Distribute, and Possess with Intent to Distribute a Controlled Substance and Controlled Substance Analogue |

This criminal complaint is based on these facts:

See Attachment "C"

☑ Continued on the attached sheet.

_____
Complainant's signature

Adebowale Alade, Special Agent
Printed name and title

Sworn to before me and signed in my presence.

Date: 6/26/13

City and state:        San Antonio, Texas

_____
Judge's signature

John W. Primomo, US Magistrate Judge
Printed name and title

## ATTACHMENT C

I, Adebowale B. Alade, a Special Agent (SA) with the Federal Bureau of Investigation (FBI), being duly sworn, state as follows:

      1.    I am a Special Agent with the FBI, duly appointed according to law and acting as such, and have been employed by the FBI since February 2012. As a FBI Special Agent, I am an "investigator or law enforcement officer" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. Prior to being employed by the FBI, I was employed as a Police Officer with the Gainesville Police Department, Gainesville, Florida, for approximately nine (9) years. In addition to working patrol, my assignments included serving as a Federal Task Force Officer and an undercover officer in drug investigations. I am currently assigned to the San Antonio Division, Violent Crimes and Major Offender Squad of the FBI. Since becoming a Special Agent, I have participated in numerous criminal investigations, including many involving organized criminal enterprises, violent gangs, public corruption and drug trafficking. I have conducted or participated in physical and electronic surveillance, including court-authorized wire and electronic interceptions, execution of search warrants, debriefings of informants and reviews of taped conversations and narcotics records. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are imported and distributed, the method of payment for such drugs, and the efforts of persons involved in such activities to avoid detection by law enforcement. Among other duties, I am currently involved in an investigation that focuses on the illegal activities a drug trafficking organization based in San Antonio, Texas, numerous other states and internationally.

## LOCATIONS TO BE SEARCHED

2.      This affidavit is made and submitted in support of an application for arrest and search warrants for the following locations within the Western District of Texas:

A.      15515 Portales Pass, Helotes, Texas: Residence of Muhammad & Salma Jaffer Ali

B.      5623 Dha.k.a. View, San Antonio, Texas: Residence of Ashekul Mowla

C.      91 Big Horn Canyon, San Antonio, Texas: Residence of Syed Ali

D.      5562 Rangeland Street, San Antonio, Texas: Residence of Yong Chong

E.      6400 Wurzbach Road, Apt. 2108, San Antonio, Texas: Residence of Prasanta Bardhan

F.      5403 Evers Road, San Antonio, Texas: Best Foods #2

G.      11421 West Avenue, San Antonio, Texas: Hang Ten Smoke Shop

H.      6604 N.W. Expressway, San Antonio, Texas: A-AAAKey Mini Storage, units 250 & 502

I.      5555 N.W. Loop 410, San Antonio, Texas: A-AAAKey Mini Storage, units 80, 243, 275, 281, 364, 399, 436, & 534

J.      6627 Topper Run, Suite 102, San Antonio, Texas: Suspected lab

K.      16939 Nacogdoches, San Antonio, Texas: The Storage Center, units 1002

L.      999 FM 1518, Schertz, Texas: Covey's Happy Mini Storage, units A-28, F-09, I-17, J-18, J-22, J-24, J-26, J-28 and J-30

M.      14989 Judson Road, San Antonio, Texas: Judson Storage, units 2303 & 2326

N.      14815 Jones Maltsberger, San Antonio, Texas: Public Storage, unit 262

O.      13800 Nacogdoches, San Antonio, Texas: Public Storage, unit 278

P.      9415 North IH-35, San Antonio, Texas: Pioneer Stor & Lok, units 16 & 17

2

...

Q.    8525 Perrin Beitel, San Antonio, Texas: Smokers Galaxy

R.    703 W. Rhapsody, San Antonio, Texas: Gloria's Food Mart

S.    1502 Hildebrand, San Antonio, Texas: Hildebrand Grocery

T.    7031 Ray Bon, San Antonio, Texas: Ray Bon Grocery

U.    530 S. General McMullen, San Antonio, Texas: Anam Food Mart

V.    2111 Harry Wurzbach, San Antonio, Texas: Fort Sam Grocery

W.    6414 Wurzbach, San Antonio, Texas: Stanley's Ice House

X.    3604 Commercial Avenue, San Antonio, Texas: Fast Stop Grocery

**OFFENSES**

3.     I am familiar with relevant aspects of this investigation as a result of my personal participation in this investigation, including the review of transcripts and summaries of conversations recorded during this investigation pursuant to court authorized wire interceptions of various telephones including telephones utilized by **Muhammad JAFFER ALI** and **Ashekul MOWLA**.  I have also discussed the contents of some of the recorded conversations with Urdu, Bengali, Gujarati and Spanish speaking agents and/or monitors who have listened to the conversations.  I have participated in interviews of cooperating witnesses to include confidential human sources.  I have reviewed reports written by other agents regarding seizures of controlled substances, controlled substance analogues, precursor chemicals and other materials as well as drug proceeds associated with the persons under investigation and I have spoken personally with many of the agents involved in such seizures.  I have also reviewed the photographs taken, the documents seized and the intelligence learned as a result of said seizures.  On the basis of this familiarity, and on the basis of other information which I have reviewed and determined to be reliable, as will be detailed more fully below, I believe there is probable cause that evidence of the following crimes committed by **Muhammad JAFFER ALI, Ashekul MOWLA, Ashak WESA a.k.a. Antonio, David B. PUCEK, Dung NGUYEN a.k.a. Alex, Brian ARTHUR, R. DAN ARTHUR, Joshua Louis HASNESS a.k.a. Josh, Amir Nabil Shaker SENADA a.k.a. Sam, Salma JAFFER ALI, Faizan ALI, Luz Abril GARCIA, Irma ZERTUCHE-Santillan a.k.a. Natalie or Nathly, Gulzar DHARANI a.k.a. Gloria, Abu Mohammad Mafttah UDDIN a.k.a. Paul, Syed ALI, Yong CHONG a.k.a. Sam, Derrick SANTILLAN, Prasanta BARDHAN,** and others known and unknown, who have aided and abetted in the commission of these federal offenses will be found in the premises named herein:

4

(a) distribution of and possession with intent to distribute controlled substance and controlled substance analogues, cannabinoids, also known as synthetic marijuana and substituted cathinones, also known as bath salts, all of which are set forth in Sections 802(32),802(34), and 813 of Title 21;

(b) attempts and conspiracies to do the same, all in violation of Sections 841(a)(1) and 846 of Title 21, United States Code;

(c) importation of controlled substance and controlled substance analogues, cannabinoids and substituted cathinones into the United States, all in violation of Section 960 of Title 21, United States Code;

(d) attempts and conspiracies to do the same, all in violation of Sections 952(a) and 963 of Title 21, United States Code;

(e) use of wire facilities to facilitate the commission of the offenses described in subparagraphs (a), (b), (c) and (d) above, in violation of Title 21, United States Code, Section 843(b);

(f) money laundering and conspiracies to do the same, in violation of Title 18, United States Code, Section 1956 and 1957;

(g) structuring transactions to evade reporting requirements, in violation of Title 31, United States Code, Section 5324; and,

(h) aiding and abetting the offenses described in subparagraphs (a), (c) and (f) above, in violation of Title 18, United States Code, Section 2.4.        The items sought constitute fruits, proceeds, evidence, and instrumentalities of violations of the federal felony offenses all as listed above in paragraph 3.  Based upon my training and experience, I know the

5

following regarding drug trafficking generally:

Traffickers, dealing in and manufacturing controlled substances and controlled substance analogues hereinafter referred to generically as drugs, commonly keep their supply of drugs or precursor chemicals on hand for immediate access. These drugs and precursor chemicals are commonly kept on the trafficker's person, in their home, in secondary locations such as storage units or in their vehicles. Traffickers also typically store large amounts of drugs and/or precursor chemicals in locked containers or security containers to protect their investment in the drugs;

Persons involved in large scale drug trafficking and/or money laundering almost always keep records of their transactions; because drug trafficking generates large sums of cash, it requires the keeping of detailed records as to the purchase and distribution of drugs as well as the laundering of the proceeds; drug traffickers and money launderers typically keep documents, or data on computers and other electronic media capable of storing data and/or images, demonstrating the purchase of assets, as well as bank records and other evidence of the accumulation of wealth through illegal activities, as well as the methods used to lauder the proceeds; such records also typically provide evidence as to the identity of additional criminal associates who are facilitating the laundering of the drug proceeds on behalf of the organization; these records, unlike the controlled substances, are often maintained for long periods of time; such records are often maintained under the dominion and control of the drug traffickers and money launderers, and as such, are often kept in their residences, businesses, or other locations that they control;

Drug traffickers commonly maintain addresses or telephone numbers in books, papers, or on computers, cellular telephones/smart phones, as well as on other types of electronic media capable of storing such data, which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

It is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances; the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the drug traffickers have ready access to them;

Drug traffickers often take or cause to be taken photographs or video movies of themselves; their associates, their property and their product; these traffickers usually maintain these photographs in their possession or post them online on their own websites, or on their personal and/or business profiles on social media sites, such as Facebook;

Large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates or business entities to avoid detection of these assets; Even though these assets are in names other than the drug traffickers', their true owners will continue to exercise dominion and control over the use, ownership, and disposition of these assets;

6

Large-scale drug traffickers must maintain on-hand large amounts of U.S. currency in order to maintain and finance their ongoing drug business and typically possess cash counting machines to aid in their business;

It is common for large-scale drug dealers to secrete contraband, proceeds of drug sales and records of drug transactions as well as asset purchases in secure locations within their residences, businesses and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

In order to accomplish this concealment, drug traffickers frequently build "stash" places or utilize "diversion safes" within their residences or business; there are a number of publications available instructing where and how to build "stash" places; copies of these types of publications have been found in the residences of drug traffickers. From the exterior, diversion safes appear to be common garage, household, or grocery items (i.e., a can of Pringles potato chips), but, in fact, are specifically manufactured and sold to conceal drugs, currency, and other valuables in containers which most law enforcement officers would not normally check for such items. Diversion safes are advertised in publications that traffickers in synthetic drugs utilize for business, such as B2B Wholesale Magazine, and are displayed by exhibitors at business-to-business trade shows where traffickers in synthetic drugs also exhibit and attend;

It is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers; these items are maintained by the drug traffickers within their residences, businesses or other locations over which they maintain dominion and control;

Large-scale drug traffickers often utilize electronic equipment such as computers, flash drives, cellular phones, smart phones and other devices and software to communicate and to store electronic data such as records, contact information and other data relevant to their drug trafficking activity;

The courts have recognized that the manner in which the currency is handled, carried and concealed may establish probable cause that there is a substantial connection between the questionable currency and drug transactions;

When drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities; to accomplish these goals, drug traffickers often utilize domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large

7

quantities of cash;

Individuals involved in multi-state illegal drug distribution activities often open checking accounts at financial institutions that have numerous branches throughout the United States. They then instruct their customers to deposit cash into these accounts as payment for drugs. This allows the customer's identity to be concealed and for promotion of the illegal activity because of the distributor's immediate access to payments from customers located long distances away;

The Currency Transaction Report (CTR) (FinCEN Form 104) which is required to be completed and filed with FinCEN by all financial institutions on every currency transaction which exceeds $10,000, causes tremendous problems for drug traffickers when they attempt to negotiate their illegal profits at a financial institution, and that in order to evade the filing of a CTR, drug traffickers often "structure" their currency transactions so that no one transaction exceeds $10,000, or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

Drug traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state or local agencies. In order to legitimize their spending, these traffickers commonly file tax returns reporting income commensurate with the amount of money they have spent during the year which they feel can be traced and documented by the government; the "source" of their income reported on these returns is usually falsely stated, misleading or generic in terms; retained copies of these returns are commonly kept by the traffickers in their residences, businesses , and other locations under the dominion and control of drug traffickers;

Drug traffickers commonly have in their possession, that is on their person, at their residences and/or their businesses, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons; said firearms are used to protect and secure a drug trafficker's property. Such property may include but is not limited to drug, jewelry, drug paraphernalia, books, records and United States currency; and

The techniques and practices used by drug traffickers to avoid detection by law enforcement include, but are not limited to, the use of multiple locations at which to conduct drug related activities and to keep records and drugs, the use of proxy businesses and proxy agents, mail drops and P.O. Boxes, websites and proxy servers/contacts, commercial shipping businesses such as UPS and FedEx to receive and ship drugs, electronic wire transfers and payment systems, computers, email, voice mail, Short Message Service (SMS) and Multimedia Messaging Service (MMS) messages (commonly referred to as text messages), Caller I.D. masking or spoofing services, cellular telephones/smart phones, pay phones, and the use of numerous associates and "workers" or "mules" to further their criminal enterprise.

2.     Based upon my training and experience, I further know the following as it relates to

drug trafficking in controlled substance analogues, specifically synthetic cannabinoids:

8

The unique danger regarding the trafficking of products containing synthetic cannabinoids is that the end-distributor is many times a "brick and mortar" retailer, marketing its wares to the public, providing an easy and seemingly legitimate avenue for the general public to obtain these often dangerous compounds. Therefore, product manufacturers and distributors regularly utilize a variety of private laboratories to generate "does not contain" reports that are forwarded on with their products to the wholesale and retail level. These "does not contain" reports are used in an attempt to bolster the apparent legality of the products by listing, at the request of manufacturers and distributors, specific illegal substances that are not contained in the product, while excluding others that are in fact in the product. As such, the reports are used in an attempt to thwart law enforcement efforts to enforce laws and ordinances regarding synthetic drugs, and the reports are further customized as to the specific states' current laws relating to synthetic cannabinoids. Through their actions, the wholesalers and retailers demonstrate their knowledge that despite these reports, such products are not legal to distribute or sell for human consumption. I know that despite being one of the most profitable items to end-distributors, products containing synthetic cannabinoids are normally kept out public view, and customers purchasing these products typically must be "known" to the business owners/agents, in an attempt to evade detection of trafficking activities by law enforcement.   I am aware that the manufacturers and distributors are provided a "does contain" report that details the chemicals present in their products, but these reports are not normally provided to wholesalers or retailers. Furthermore, I know that manufacturers and distributors are now employing attorneys to submit samples to the labs for an analysis on their behalf, so if law enforcement gets a copy of the report, the manufacturer's or distributor's name and identifying information will not be printed on it, and the attorneys will claim "attorney-client" privilege when approached by law enforcement, thus aiding in concealing their identities and drug trafficking activities. Attorneys also provide their manufacturer and distributor clients letters for their retailer clients, providing a legal opinion as to the compliance of the products in an attempt to further thwart law enforcement efforts regarding the distribution and sale of these drugs;

Traffickers in synthetic cannabinoid products frequently travel to China, Taiwan, and Hong Kong, which are source countries for the precursor chemicals and compounds as well as for the packaging used for retail sales of such products. In addition, traffickers who conduct interstate transportation and distribution of controlled substances must transport the controlled substances themselves or have couriers, including businesses such as the United Parcel Service (UPS) and Federal Express (FedEx), transport the drugs for them. Consequently, drug traffickers often keep records of such travel, including airline tickets, bus tickets, rental car receipts, as well as records of shipments of drugs and payments for drug shipments received through UPS and FedEx, as most shipments of synthetic cannabinoid products are sent C.O.D.; and

Traffickers in synthetic cannabinoid compounds and products commonly utilize storage facilities to manufacture and/or store drugs, records, assets, and other evidence of their trafficking activities. The traffickers also commonly use mail boxes at commercial locations, such as the UPS Store, as business addresses to receive drug shipments and correspondence related to their trafficking activities. I know that packages delivered to these locations are commonly received on the recipient's behalf by unwitting employees of the storage facilities and commercial mail box

locations, and are kept in the office areas until the designated recipient comes to the business to collect them.

3.     This affidavit is based upon my personal knowledge, and upon information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Some of the facts in this affidavit were also provided by confidential human sources (CHS), one of which has previously been involved in the distribution of synthetic cannabinoid products.

4.     Because this affidavit is submitted for the limited purpose of securing authorization for a search warrant and complaints, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish the necessary foundation for the requested search warrants.

## STATUTORY AND FINANCIAL BACKGROUND

### Controlled Substance Analogue Enforcement Act of 1986

5.     In 1986, the Controlled Substances Act ("CSA") was amended by the Controlled Substance Analogue Enforcement Act. This amendment added 21 U.S.C. § 813, which provides: "A controlled substance analogue shall, to the extent intended for human consumption, be treated, for the purposes of any Federal law as a controlled substance in schedule I." The term "controlled substance analogue" is defined in 21 U.S.C. § 802(32)(A) to be a substance which:

(1) has a chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;

10

(2) has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or

(3) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

## SYNTHETIC CANNABINOIDS

6.      The following are the full chemical names for the synthetic cannabinoid compounds referenced in this affidavit:

* AM-2201:   1(5Fluoropentyl)3(1naphthoyl)indole

* JWH-018:   1pentyl3(1naphthoyl)indole

* UR-144:   1-Pentyl-3-(2,2,3,3-tetramethylcyclopropoyl)methanone

* 5FUR-144:   1-(5-Fluoropentyl)-3-(2,2,3,3-tetramethylcyclopropoyl)methanone

* XLR11: [1-(5-fluoropentyl)-1H-indol-3-yl](2,2,3,3-tetramethylcyclo-propyl)methanone

* AKB48:   N-(1-Adamantyl)-1-pentyl-1H-indazole-3-carboxamide

Based on my training and experience I know that, in recent years, individuals have begun to manufacture and traffic in synthetic cannabinoid products, of which two of the past popular brand names were "Spice" and "K2."  These products are a mixture of an organic carrier medium, such as the herb-like substances Marshmallow and Damiana, which is then mixed with one or

11

more synthetic cannabinoid compounds which have a chemical structure similar to tetrahydrocannabinol ("THC"). THC is the psychoactive ingredient in marijuana.

7. Hundreds of types of synthetic cannabinoid compounds exist, of which five were designated as Schedule I controlled substances on March 1, 2011, through the Drug Enforcement Administration's emergency scheduling authority under 21 U.S.C. § 811(h)(2). The substances placed into Schedule I are 1-pentyl-3-(1-naphthoyl) indole (JWH-018), 1 butyl-3-(1-naphthoyl) indole(JWH-073),1-[2-(4-morpholinyl)ethyl]indole(JWH-200),5-(1,1-dimethylheplyl)-2-[(1R,3 S)-3-hydrooxycyclohexyl]-phenol(CP-47,497),and5-(1,1-dimethyloctyl)-2-[(1R,3S) -3-hydroxycyclohexyl]-phenol (cannabicyclohexanol; CP-47,497 C8 homologue).

8. In response to this emergency scheduling, clandestine manufacturers and traffickers began distributing synthetic cannabinoid products containing slightly varied compounds in an attempt to circumvent newly enacted federal and state laws. Synthetic cannabinoid products are commonly sold in head shops, tobacco shops, convenience stores, adult stores, and over the Internet. They are often marketed as incense, potpourri, or "fake weed" and their packages often carry the markings "not for human consumption." Distributors of these synthetic cannabinoid products utilize these product names and markings in an attempt to disguise the products as containing controlled substance analogues of the emergency scheduled synthetic cannabinoid compounds. Users of these products have reported intense hallucinogenic effects including, but not limited to, paranoia, panic attacks, increased heart rate, hallucinations, and increased blood pressure.

12

**DEA Identified AM-2201, UR-144 and 5FUR-144 as Analogues of JWH-018**

9.    DEA determined that the following synthetic cannabinoid compounds are controlled substance analogues of the schedule I controlled substance JWH018: AM-2201, UR-144, and 5FUR-144. As such, 21 U.S.C. § 813 provides that AM-2201, UR-144, and 5FUR-144, to the extent intended for human consumption, shall be treated as Schedule I controlled substances under Title 21, U.S.C.

**Effective May 16, 2013, UR-144, XLR11, and AKB48 were temporarily placed in Schedule I for 2 years. The three substances were found to pose an imminent hazard to public safety. The Final Order will impose administrative, civil, and criminal sanctions and regulatory controls of Schedule I substances under the CSA on the manufacture, distribution, possession, importation, and exportation of these synthetic cannabinoids. UR-144, XLR11, and AKB48 have been encountered extensively laced on plant material and marketed under the guise of "herbal incense".

**The Synthetic Drug Abuse Prevention Act of 2012**

10.   On July 9, 2012, the Synthetic Drug Abuse Prevention Act of 2012 was signed into law. The act permanently added JWH-018 and AM-2201 to Schedule I under Title 21.

**Money Laundering**

Title 18, U.S.C. §§ 1956(c)(7)(A) and 1961(1)(D), define violations of 21 U.S.C. §§ 841 and 846 as "specified unlawful activities" for the purposes of money laundering in violation of 18 U.S.C. §§ 1956 and 1957.[1]

---

[1]  18 U.S.C. § 1957(f)(3).

11.    Engaging in a conspiracy to commit money laundering is a violation of 18 U.S.C. §
1956(h).  Based on my training and experience, I know that a conspiracy is an ongoing offense
and that a conspiracy, while not required by law under 18 U.S.C. § 1956(h), often involves one or
more overt acts in furtherance of the conspiracy.

Based on my training and experience, I know that:

Individuals involved in illegal sale of controlled substances or other unlawful activities
often generate large amounts of criminal proceeds.  These individuals are often motivated to use
the money to facilitate and promote the operation of their illegal activities by purchasing additional
product for future sales or to finance the expansion of their illegal enterprise.  These individuals
also use the money generated to purchase legitimate personal items, such as real estate,
automobiles, watercraft, and jewelry.

Individuals attempting to conceal their criminal proceeds or illegal activities will
frequently place assets in the names of friends, relatives, or close associates to avoid detection of
these assets by government agencies.  Even though these assets are in the names of others, their
true owners will continue to exercise dominion and control over the use, ownership, and
disposition of these assets.

Individuals involved in illegal activities often utilize domestic and international banks and
their attendant services.  They may often attempt to establish a "front" operation (business or shell
corporation) which allegedly generates large quantities of cash in order to make it appear as if their
wealth was legitimately obtained.  In addition, they will often use checking and savings accounts
at financial institutions.  Frequently, these individuals have some sort of legitimate income and
funds, and co-mingle their illegal profits with their legitimate funds.  This helps to conceal the
illegal source.  These individuals also utilize the movement of funds amongst various accounts
and engage in the seemingly random opening and closing of bank accounts in an attempt to further
conceal the source of the funds.

Individuals involved in the manufacture, distribution, and sale of illegal products, such as
narcotics, often utilize a large amount of cash transactions to conduct business in an attempt to
avoid detection and to finance their on-going business operations.

All of these methods employed by individuals to conceal illegal funds and utilize illegally
obtained proceeds to promote ongoing operations are what I generally refer to as "money
laundering."

14

Currency Transaction Reports

12.     FinCEN Form 104, which is also known as a Currency Transaction Report ("CTR"), is a form filed with the United States Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") by financial institutions when more than $10,000 in currency is deposited or withdrawn from a specific customer's accounts in a single business day.  Based on my training and experience, I know that it is a crime under Title 31, U.S.C. to cause a false CTR to be filed.  I further know that a false CTR can assist in money laundering by concealing the source and nature of illegal proceeds deposited into financial accounts and is a violation of 18 U.S.C. § 1956(a)(1)(B)(ii).

COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

13.     As described above and in Attachment B, this application seeks permission to search for records that might be found on any of the Subject Premises, in whatever form they are found.   One form in which the records might be found is data stored on a computer's hard drive or other storage media.   Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

14.     Probable cause.  I submit that if a computer or storage medium is found on the Subject Premises, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather,

15

that data remains on the storage medium until it is overwritten by new data.

Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

Based on actual inspection of other evidence related to this investigation, including emails and invoices from the targets, I am aware that computer equipment was used to generate, store, and print documents used in this drug trafficking scheme. There is reason to believe that there are computer systems currently located on at some or all of the Subject Premises.

15. Forensic evidence. As further described in Attachment B, this application seeks

permission to locate not only computer files that might serve as direct evidence of the crimes

described on the warrant, but also for forensic electronic evidence that establishes how computers

were used, the purpose of their use, who used them, and when. There is probable cause to believe

that this forensic electronic evidence will be on any storage medium in the Subject Premises

because:

Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were

16

created and the sequence in which they were created, although this information can later be falsified.

Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

16. <u>Necessity of seizing or copying entire computers or storage media.</u> In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the Subject Premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on

the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

*The time required for an examination.* As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

*Technical requirements.* Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

*Variety of forms of electronic media.* Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

17. <u>Nature of examination</u>. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which I am applying would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant. Therefore, I respectfully request that the Court indicate that once seized, the actual execution of the search on the computer or computer(s) in question may be executed at anytime in the day or night in a laboratory setting

and that the return be due in a reasonable amount of time. The latter request is being made because based on me being advised that a search of a computer and related electronic storage format takes longer than the usual ten (10) days because of the technology involved in reviewing and searching said items. Alternatively, I would seek a return, if not for a reasonable amount of time, a time period not to exceed thirty (30) days.

## BACKGROUND

18.    In January 2012, an FBI San Antonio confidential human source (CHS-1) identified business partners **Muhammad JAFFER ALI** and **Ashekul MOWLA** as large-scale distributors of synthetic marijuana and bath salts at various convenience stores, smoke shops, and flea markets in San Antonio, Texas and various other U.S. cities to include but not limited to Houston, Austin, Dallas, Laredo, as well as Tulsa and Oklahoma City, Oklahoma. **JAFFER ALI** and his wife, **Salma JAFFER ALI** own Best Foods #2, a convenience store/Phillips 66 gas station at 5403 Evers Road, San Antonio. Synthetic narcotics are sold at this location. **Muhammad JAFFER ALI** and **MOWLA** are partners in Hang Ten Smoke Shop, located at 11421 West Avenue, San Antonio, Texas. Synthetic narcotics are also sold at this location.

19.    Investigation to date confirms that **JAFFER ALI** regularly travels within and around San Antonio, Houston, Austin, Dallas and various other Texas and Oklahoma cities. According to sources, including FBI CHS-1, **MOWLA** is responsible for distribution within San Antonio as well as to various cities along the southern border of Texas from Corpus Christi to Laredo. FBI CHS-1 also advised that **JAFFER ALI** interacts directly with several chemists who are manufacturing/producing synthetic narcotic products for the **JAFFER ALI** drug trafficking organization (DTO) to distribute. To date, the investigation has identified the

following individuals as chemists manufacturing synthetic cannabinoids for **JAFFER ALI**: **Dung NGUYEN a.k.a Alex, Joshua Louis HASNESS a.k.a. Josh, Brian ARTHUR, Robert Daniel ARTHUR a.k.a Dan,** and **Ashak WESA a.k.a. Antonio.** To carry out the full scope of the DTOs activities, **JAFFER ALI** employs the assistance of the following individuals beyond himself, **MOWLA** and the noted chemists:

20. **Salma JAFFER ALI – Muhammad JAFFER ALI's** wife who assists **JAFFER ALI** in the day to day activities, including the sale of synthetic marijuana products, at Best Foods #2, a convenience store/Phillips 66 gas station at 5403 Evers Road, San Antonio which they own. She is also highly involved in the laundering of the proceeds of their illegal activities.

21. **Abu Mohammad Mafttah UDDIN a.k.a. Paul** – runs the day to day activities of Hang Ten Smoke Shop, is **MOWLA's** nephew and resides with **MOWLA.**

22. **Luz Abril GARCIA** – cashier at Best Foods where she actively sells synthetic marijuana products and has obtained storage units in her name for use by the DTO.

23. **Irma Zertuche-SANTILLAN a.k.a. Natalie a.k.a. Nathly** – transports synthetic marijuana products between San Antonio, Houston, Dallas, and Austin at **JAFFER ALI's** direction.

24. **David PUCEK** – lives in Louisville, Kentucky, and is **JAFFER ALI's** main supplier of damiana and marshmallow leaves and brokers the sale of chemicals used to manufacture synthetic marijuana products for distribution by the DTO.

25. **Amir Nabil Shaker SENADA** – right-hand man of chemist **Ashak WESA a.k.a. Antonio.** SENADA oversees **WESA's** manufacturing operations including what is believed to be a lab at 6627 Topper Run, San Antonio.

20

26.   **Gulzar DHARANI a.k.a. Gloria** – owner/operator of the following five (5) convenience stores in San Antonio where synthetic marijuana products supplied by the DTO are sold: Gloria's Food Mart, Anam Food Mart, Fort Sam Grocery, Hildebrand Grocery and Ray Bon Grocery.   **DHARANI** also assist in the laundering of the DTO's drug proceeds.

27.   **Syed ALI** – owner/operator of Smokers Galaxy, 8525 Perrin Beitel, San Antonio, where synthetic marijuana products supplied by the DTO are sold.

28.   **Yong CHONG** – distributor of synthetic marijuana products supplied by the DTO.

29.   **Prasanta BARDHAN** - distributor of synthetic marijuana products supplied by the DTO.

30.   **Derrik SANTILLAN** – employee at Hang Ten Smoke Shop, also the renter of storage units 399,436 and 534 at A-AAAKey Mini Storage, 5555 N.W. Loop 410, San Antonio, Texas, used by the DTO to safely store the synthetic marijuana products which they distribute as well as possibly precursor chemicals and other products used by the chemists.

31.   **Faizan ALI** – **JAFFER ALI's** right hand man in Houston overseeing the acceptance and distribution of precursor materials and finished products as well as collecting proceeds from buyers on **JAFFER ALI's** behalf.

32.   On April 4, 2013, United States District Judge Xavier Rodriguez issued an Order authorizing a Title III wiretap on (210) 838-4110, (210) 417-0557, (210) 367-7058 and (210) 838-4110 known to be utilized by **JAFFER ALI** or **MOWLA**.   This Order was renewed on May 10, 2013 and June 7, 2013.   Pursuant to this Order, the FBI has intercepted numerous telephone conversations and text messages between **JAFFER ALI**, **MOWLA**, and numerous others

21

concerning the illegal production, storage, distribution, and sale of various kinds of synthetic narcotics by **JAFFER ALI, MOWLA,** and their associates.

## PROBABLE CAUSE

33.     On January 10, 2012, at the direction of the FBI, after negotiations with **JAFFER ALI,** FBI CHS-1 took receipt of approximately ninety-six (96) packets of cannibinoids (synthetic marijuana) from **MOWLA** while under surveillance by agents.   The packages were provided to agents for the purpose of submission to the Texas Department of Public Safety Laboratory to determine whether they contained controlled substances.   Lab test confirmed the presence of AM-2201 and JWH-073.   At the time, JWH-073 was already a federally banned Schedule 1 substance and AM-2201 was banned at the state level.

34.     On October 16, 2012, DEA San Antonio CHS-1 and an undercover agent made separate controlled purchases of synthetic marijuana from Best Foods-2.   Soheb MARDHANI was working at the store and made the sales.   During the sale to the undercover agent, who consensually recorded the conversation, MARDHANI discussed the "high" and/or effects a person could experience when consuming the products, even though the packages purchased by DEA CHS-1 and the undercover agent were label "not for human consumption."

35.     As stated previously in this affidavit, **JAFFER ALI** and **MOWLA** own Hang Ten Smoke Shop on West Avenue in San Antonio.   **MOWLA**'s nephew, **Abu Mohammad Mafttah UDDIN,** runs the day to day operations of the business.   On November 13, 2012, DEA San Antonio CHS-1 made a controlled purchase of synthetic marijuana from **UDDIN** at Hang Ten. The next day, surveillance observed **Yong CHONG** placing several boxes in his vehicle which he obtained from the business.   A traffic stop and subsequent consent search of his vehicle resulted

in the seizure of approximately 2,100 packages of synthetic marijuana, marketed under the names Kush and Klimax. **CHONG** stated to officers that he was taking the items to 5403 Evers (Best Foods #2) at the direction of **MOWLA**. **CHONG** was not arrested. Subsequent to the traffic stop, agents executed a consent search of Hang Ten and seized approximately 9,500 packages of synthetic marijuana. The seized items were packaged using over 50 different brand names. Later that day **JAFFER ALI** made contact with one of the investigating agents and acknowledged ownership of the seized items stating that he had lab reports documenting the products were not illegal. DEA lab analysis indicated the representative samples of the seized products contain 5FUR-144 or XLR-11.

36. In early January 2013, FBI San Antonio received information of Middle Eastern males purchasing a large quantity of Acetone. Counter Terrorism agents initiated an investigation to determine the intent of the purchaser's use of the chemical, which is not illegal to possess but is a common bomb making component. On January 10, surveillance identified **Syed ALI** taking receipt of approximately sixty (60) gallons (12 five-gallon buckets) of Acetone from a company in San Antonio. After being traffic stopped and identified, **ALI** was surveilled to a storage facility on Perrin Beitel and subsequently Smokers Galaxy, which **ALI** and his business partner A.R.K. own.

37. Agents are aware that Acetone is also utilized in the manufacturing of synthetic marijuana. Damiana and/or marshmallow leaves are initially washed in acetone and dried. The damiana and/or marshmallow is then sprayed with various chemicals which when burned/smoked produce the desired hallucinogenic effect for the user. The acetone is believed to allow a more effective absorption of the chemicals sprayed on the product. The damiana and/or marshmallow

23

is then packaged in varying gram quantities per bag under numerous brand names as mentioned previously in this affidavit.

38.     On January 24, 2013, **Syed ALI** was interviewed at his home by agents in furtherance of the mass destruction investigation.   During the interview, **ALI** appeared very nervous and gave conflicting statements regarding his intended use of the acetone he purchased on January 10.   He did allow agents to follow him to the above-noted storage unit to observe the containers.   A.R.K. met **ALI** and the agents at the storage facility with the key to the unit. Twelve containers, six full and six empty, were located inside the storage unit.   Also seen in the unit were multiple boxes with "MAGNUM DETOX" stamped on the side in red.   Agents are aware that this product is commonly utilized by drug users prior to having to provide urine samples in an attempt to hide and/or eliminate the presence of illegal substances.

39.     In late January 2013, FBI CHS-1 advised agents that S.M. indicated he (S.M.) has transported boxes of damiana and/or marshmallow to **JAFFER ALI**'s storage units in Houston, Texas, where **JAFFER ALI** had S.M. meet with an unspecified individual.   S.M.   stated that **JAFFER ALI** is having Klimax manufactured at these units.

40.     On January 31, 2013, FBI CHS-2 consensually recorded a conversation with **JAFFER ALI**.   During the conversation, FBI CHS-2 informed **JAFFER ALI** that FBI CHS-2 was "looking to buy product" from **JAFFER ALI**, mentioning "10 gram Klimax and 10 gram Angry Birds."   **JAFFER ALI** responded saying "the Angry Bird right now we don't have it we out of the bags" and asked "what else you need."   FBI CHS-2 told **JAFFER ALI** that FBI CHS-2 was dealing with "oil workers" and "they want strong product."   **JAFFER ALI**

24

commented he had "everything" and that if he (**JAFFER ALI**) wasn't available when FBI CHS-2 was in town that his "guy" would take care of FBI CHS-2 and show all the products.

41.     Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe that when **JAFFER ALI** commented that he did not have "Angry Birds" and that they were "out of the bags" he was referring to not having the empty pre-printed bags with the Angry Bird name and logo on them which he would utilize to package the product after he and/or his associates manufactured it, possibly in the Houston area. **JAFFER ALI** is known to receive pre-printed packages, thousands at a time, for numerous brand names of synthetic marijuana. When FBI CHS-2 commented that the "oil workers" wanted "strong product," this was a reference to the product being consumed by the buyer, which is contrary to the packages being marked with "not for human consumption." When **JAFFER ALI** referred to his "guy" taking care of FBI CHS-2 and showing FBI CHS-2 "all the products" I believe that he (**JAFFER ALI**) was referring to **MOWLA** showing FBI CHS-2 the various brands they distribute.

42.     On February 7, 2013, at approximately 10:34 A.M. (CST), FBI CHS-2 consensually recorded a call from **MOWLA**. During this conversation, **MOWLA** agreed to meet with FBI CHS-2 that "Jeff told me to talk to you" and then asked what time FBI CHS-2 was going to be in San Antonio.

43.     That afternoon, February 7, 2013, FBI CHS-2 contacted **MOWLA** prior to meeting at Best Foods #2. Agents surveilled the meeting during which FBI CHS-2 was equipped with a transmitter and recording device. **MOWLA** arrived at the location in his silver Toyota 4Runner. **MOWLA** and FBI CHS-2 discussed various brands of synthetic marijuana and the prices of each

product. After agreeing upon prices and quantities, **MOWLA** was surveilled leaving the location and travelling to A-AAAKey Mini Storage, 5555 N.W. Loop 410 (**Location I**). While FBI CHS-2 was waiting for **MOWLA** to return, FBI CHS-2 and **Luz Abril GARCIA** engaged in a conversation regarding the sale of the synthetic marijuana at Best Foods. **GARCIA** commented to FBI CHS-2 that the users smoke the product and mentioned various brands which are the more popular brands sold at the store. Upon his return, **MOWLA** re-entered the store carrying two black plastic bags. **MOWLA** and FBI CHS-2 counted the packages as well as the $2,500.00 that FBI CHS-2 paid for the products. FBI CHS-2 turned over ninety-two (92) 10-gram packages of synthetic marijuana to agents. The following brand names were included: Klimax, Scooby Snax, Devil Eye, Atomic, Psycho, Godfather, OG and Devil Eye. Lab analysis is pending.

44. On the evening of February 12, 2013, the San Antonio Police Department (SAPD) received a call from a concerned brother of a minor-aged male who was abusing synthetic marijuana. The brother stated that the minor was purchasing the synthetic marijuana at 5403 Evers Road (Best Foods #2/Phillips 66). A uniformed officer was dispatched to the above address. The officer asked the employee behind the counter, later identified as **Luz Abril GARCIA**, if the store sold "potpourri" products. **GARCIA** acknowledged that they did and showed the officer boxes behind the counter. When asked if there were any additional such products in the store, **GARCIA** showed the officer a large assortment in the back room. The SAPD Narcotics Unit was dispatched to the location. Approximately $500,000.00 worth of synthetic marijuana and several thousands of empty packages in large boxes waiting to be filled were seized from the location. **GARCIA** put detectives in contacted with **Salma JAFFER ALI**

who told the detectives that **GARCIA** could handle everything. She **(Salma JAFFER ALI)** stated she was at a game with her son and did not have time to come to the location. Initial laboratory results indicate the presence of AM-2201 in some of the products seized.

45.     On April 6, 2013, pursuant to the court-ordered wire interpection, **JAFFER ALI** was intercepted receiving a call from **Dung NGUYEN a.k.a. Alex.** NGUYEN told **JAFFER ALI** "I made 5,000 Godfather 10 grams but I need to pack it." NGUYEN then told **JAFFER ALI** "he will give you $2.00 on every bag he sells $2 and the other Alex ok same thing he will give you a dollar I'll give you a dollar you get $2.00 on everything he sells." "So he ordered 15,000 so you get $2.00 from every bag." Toward the end of the conversation **NGUYEN** told **JAFFER ALI** that "A52 has a red lock on the lock on A52."

46.     Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe **NGUYEN** was at a storage facility belonging to **JAFFER ALI** attempting to deliver an unspecified quantity and name brand of synthetic narcotics to **JAFFER ALI**, but the rent had not been paid and therefore **NGUYEN** was not able to access unit A52 at Great Value Storage, 9951 Harwin, Houston, Texas, as he had planned. When **NGUYEN** talked about **JAFFER ALI** receiving "$2 from every bag" I am aware of an agreement **JAFFER ALI** made with several of the wholesalers in Houston wherein **JAFFER ALI** receives a broker fee/commission on the sale of any product manufactured by **NGUYEN**.

47.     On April 8, 2013, **JAFFER ALI** was intercepting placing a call to **David PUCEK**. During the conversation, **PUCEK** stated he was "tallying up all these March monthlies." **JAFFER ALI** asked **PUCEK** "how many you (PUCEK) sending in?" **PUCEK** responded,

"Let's see I got yours right here, so I've got with your balance, let's see I can send you, I think 4,000 pounds of marshmallow and 1,000 pounds of damiana, and that covers the shipping too."

48.   Based upon my training, experience, and conversations with other agents involved in this investigation, I believe **PUCEK** was tallying up records he maintains of his sales of damiana, marshmallow, and chemicals for the month of March 2013.  I also believe **PUCEK** reviewed records he maintains regarding **JAFFER ALI's** account with **PUCEK** when he (**PUCEK**) told **JAFFER ALI**, "let's see I got yours right here, so I've got with your balance, let's see I can send you, I think 4,000 pounds of marshmallow and 1,000 pounds of damiana, and that covers the shipping too."

49.   On April 9, 2013, **JAFFER ALI** was intercepted speaking with **Robert Daniel ARTHUR**.  **ARTHUR** stated that "Brian" had said **JAFFER ALI** had called.  **JAFFER ALI** asked if he could meet with **ARTHUR** and/or "Brian."  **ARTHUR** requested that **JAFFER ALI** come to "the bar around noon tomorrow."  **JAFFER ALI** asked "what kind of product" they were currently making.  **ARTHUR** responded that the "new formula" was "all legal" and that they had "1.5 gram and 3 gram packs."  **JAFFER ALI** told **ARTHUR** that he (**JAFFER ALI**) buys "in bulk" "like 10,000 pieces" "not in hundreds."  They agreed to meet at the bar the next day.  The same day at approximately 7:55 P.M., **JAFFER ALI** received a SMS text message from **ARTHUR** that stated "Got the factory working on 5000 2g Titanic @ 2.50 and 1000 3G Top Shelf @ 3.75".

50.   On April 10, 2013, at approximately 5:34 P.M., **JAFFER ALI** called **PUCEK**. **JAFFER ALI** told **PUCEK** that an unspecified individual had "200" that **JAFFER ALI** wanted to "collect."  **PUCEK** asked "where" did **JAFFER ALI** want the 200 sent to and **JAFFER ALI**

28

replied "Cali." **PUCEK** asked if **PUCEK** could "go to Cali and pick up the cash" and then have the items shipped. **JAFFER ALI** said **PUCEK** would see "$45,000.00 in the bank by noon tomorrow." **PUCEK** stated he (**PUCEK**) had just "sent 3,000 pounds of marshmallow and damiana is going out tomorrow."

51. Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I know that **PUCEK** is responsible for the importation, transportation and distribution of multi-ton quantities of marshmallow and damiana leaves into and throughout the United States. When **JAFFER ALI** referred to another individual having "200" and wanting them shipped to "Cali," I believe **JAFFER ALI** was referring to 200 kilograms of chemical (possibly UR-144 or XLR-11) used in the manufacturing of synthetic marijuana and he wanted them delivered to an unspecified address in California. I believe **JAFFER ALI** has a chemist in California who is manufacturing items for distribution by **JAFFER ALI**.

52. On April 12, 2013, **JAFFER ALI** was intercepted receiving a telephone call from **Robert Daniel ARTHUR a.k.a. Dan** and had the following conversation: **ARTHUR** said the "stuff is ready." **JAFFER ALI** then asked if **ARTHUR** had the "lab report" stating he needed "both of them" "like what the ingredients in there. I mean like, like 2 reports you know, like the one that what is in there and what is not in there," "my buyer is way picky, he buy big quantity but the problem is he (unintelligible)." **JAFFER ALI** stated he would get to the bar between 3:00 and 4:00pm. Later that afternoon, surveillance agents followed **JAFFER ALI** to the Parrot Pub in Spring, Texas, and observed **JAFFER ALI** and **Robert Daniel ARTHUR** loading boxes into **JAFFER ALI**'s Suburban.

29

53.     Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I know that **ARTHUR's** son is **Brian ARTHUR** who is believed to be a chemist manufacturing synthetic marijuana being sold under the brand names of "Titanic" and "Top Shelf." On April 13, 2013, at approximately 11:51 A.M., **JAFFER ALI** sent **Dan ARTHUR** the following SMS message: "Rizwan Dallas, April 13, 2013 11:44am, Zippotraders@gmail.com." Shortly thereafter, **ARTHUR** sent the following reply SMS message to **JAFFER ALI**: "Sent email with captains and DNC." When **JAFFER ALI** asked for the "lab report" "like 2 reports you know?" I believe that **JAFFER ALI** wanted to receive 2 reports regarding the same product. One report would detail all chemicals included in the product which would be used to show his buyers/distributors to prove that the appropriate chemicals where included in order for users to obtain the desired hallucinogenic effects. The other report would be utilized by the buyers/distributors to provide to the retail locations selling the products to the end user. This second report would not contain any reference to any controlled substance and/or analogue thereof. The purpose of this report was to display in a store and/or show to law enforcement officials should someone be questioned regarding the legality of the product.

54.     Based on the above referenced g-mail account, calls and text messages among other things agents obtained a search warrant for the above referenced gmail account. A review of the records obtained from the search warrant revealed laboratory reports from AIBioTech which are addressed to Herbal Mysteries, 3801 Polk, Houston, Texas 77253, Attn: Brian. The tests were conducted on synthetic marijuana brands Titanic and Top Shelf on or about January 30, 2013 and Blue Vortex on or about May 14, 2012. Each substance tested would have a cover

30

page with "1" on the bottom middle of the page and two (2) pages marked "2" at the bottom middle as though one could chose which page to include with the cover page. One of the pages marked "2" contained the wording: "By comparison with various reference standards (Table 1),......was found to be negative for the following cannabinoid classes: Naphthoylindoles, Napthylmethylindoles, Napthoylpyrroles, Naphthylmethylindenes, Phenylacetylindoles, and Cyclohexylphenoles, including," then followed by "Table 1" which noted that none of the controlled substances were detected in the product. The second page marked "2" contained the wording: "By comparison with various reference standards (Table 1), ....was found to contain:" Both of these pages for Top Shelf and Titanic were noted as containing 5F PB-22. PB-22 and 5F PB-22 are analogues of JWH-018 and therefore considered Schedule I Controlled Substances when intent for human consumption is shown.

55.    On April 14, 2013, **JAFFER ALI** was intercepted calling **Ashak WESA a.k.a. Antonio.** During the conversation, WESA asked if **JAFFER ALI** recalled when **JAFFER ALI** had approximately 5,000 pieces of "Sexy Monkey." **JAFFER ALI** acknowledged then **WESA** asked if **JAFFER ALI** still had any of that brand. **JAFFER ALI** indicated he believed he "still had most of it" but may have sold some. **JAFFER ALI** went on to say that "the problem with the product" was someone "died and the death was blamed on Sexy Monkey." **WESA** stated the reason he was asking was that the "same stuff" used to manufacture Sexy Monkey is used in 7H. **JAFFER ALI** acknowledged.

56.    Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe this conversation shows **JAFFER ALI** and **WESA**'s knowledge of humans consuming their products contrary to

the stickers and/or printing they ensure are on of their packages. Furthermore, **JAFFER ALI** appeared not to be concerned with the death of the users and just wanted to make sure if he will have chemicals to continue manufacturing the products even after the most recently ban.

57. On April 15, 2013, **JAFFER ALI** was intercepted speaking with **Ashak WESA a.k.a. Antonio.** During the conversation, **WESA** commented that he had "little sugar." **JAFFER ALI** asked what **WESA** had said. Then **WESA** said "camcorder, little camcorder." Based upon my training, experience, and conversations with other agents involved in this investigation, I believe that believe that "camcorder" is a code word used by **WESA** and **JAFFER ALI** to refer to the chemicals used to manufacture the synthetic marijuana. **JAFFER ALI** told **WESA** that he had a lot of "checks and money orders" with him that he would send to his wife tonight and that she could then get with **WESA**. I believe this discussion indicates that **JAFFER ALI** would be given cashier's checks and/or blank money orders from his customers as payment for the product. He would then launder that money through bank accounts associated with his convenience store, Best Foods 2 in San Antonio.

58. On April 16, 2013, **MOWLA** was intercepted calling **Amir Nabil Shaker SENADA A.K.A. Sam.** **SENADA** asked "how much" was **MOWLA** going to pay. **MOWLA** said he "has $17,000.00." **SENADA** said he would get with **MOWLA** later to pick up the money. **SENADA** also stated he was sending an unspecified person "with bags." **MOWLA** said he would text the "address to drop off the product." Approximately four minutes later, **MOWLA** sent the following SMS message to **SENADA**: "1502 West Hildebrand Av."

59. Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I know **SENADA** to work for

32

Ashak WESA a.k.a. Antonio in manufacturing synthetic narcotics. I believe that MOWLA was paying WESA via SENADA $17,000.00 towards an outstanding balance for previous shipments of synthetic narcotics. The above referenced address on Hildebrand is that of Hildebrand Grocery, owned by Gulzar DHARANI a.k.a. Gloria. As stated previously in this affidavit, this store sells synthetic narcotics supplied by MOWLA. I believe MOWLA was having SENADA send one of his workers to deliver an order to Hildebrand Grocery on MOWLA's behalf.

60. On April 17, 2013, JAFFER ALI was intercepted speaking with Dung NGUYEN a.k.a. Alex, a chemist manufacturing synthetic marijuana for JAFFER ALI in Houston. NGUYEN asked if JAFFER ALI does any "business" with "Soje," "Sundeep," or "Ashik." He went on to say that these individuals were arrested recently in Florida, that their telephone contacts had been collected by law enforcement, and they may be working for the police now. NGUYEN indicated he was in Florida at the time of the call making sure he cut out those individuals from anyone NGUYEN was dealing with.

61. On April 18, 2013, JAFFER ALI was intercepted calling and speaking with PUCEK. During the conversation, JAFFER ALI asked if PUCEK had anything to write with. JAFFER ALI gave PUCEK the numbers, "97, 93, 95, 95, and 9" and told PUCEK everything was "yesterday." PUCEK repeated the numbers back to JAFFER ALI. JAFFER ALI said when he can do some more, JAFFER ALI would call PUCEK. PUCEK said he would have them send them out when JAFFER ALI told PUCEK the address to ship them too.

62. Based upon my training, experience, and conversations with other agents involved in this investigation, I believe JAFFER ALI requested PUCEK to write down the structured

amounts of deposits made by or on behalf of **JAFFER ALI** into **PUCEK's** bank account(s) for the purchase of damiana, marshmallow and/or chemicals. I believe **PUCEK** was planning to ship additional damiana and marshmallow to an address to be determined by **JAFFER ALI.** I believe **PUCEK** maintains notes and ledgers that document payments made for damiana, marshmallow, and/or chemicals and the addresses to which these items are shipped.

63.     On April 18, 2013, **JAFFER ALI** was intercepted speaking with his right hand man in Houston, **Faizan ALI.** **JAFFER ALI** told **ALI** he (**JAFFER ALI**) had "to give money for AB." **JAFFER ALI** said he (**JAFFER ALI**) spoke to "Antonio" who will bring "30,000 after 4 o'clock." **JAFFER ALI** said they need to give Antonio "70 or 80" but give him "50" now. **ALI** says he (**ALI**) will pay "him 50." **JAFFER ALI** then states that he (**JAFFER ALI**) spoke to "Mike of MWI" who will "bring 14 tomorrow."

64.     Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe that **JAFFER ALI** was telling **ALI** that **Ashak WESA a.k.a. Antonio** will deliver approximately 30,000 packages of "AB" (referring to Atomic Bomb brand of synthetic marijuana) in Houston, Texas, which **WESA** was responsible for manufacturing in San Antonio, Texas. Furthermore, I believe **JAFFER ALI** was saying that he (**JAFFER ALI**) owes **WESA** $70,000.00 to $80,000.00 for this and/or previous orders of various synthetic narcotics which **WESA** is manufacturing. However, **JAFFER ALI** was telling **ALI** to pay **WESA** just $50,000.00 when **WESA** makes the delivery. I believe that **JAFFER ALI** was referring to M.C. of Mike's Worldwide Imports (MWI) owing **JAFFER ALI** approximately $14,000.00 for unspecified products previously delivered to M.C. by **JAFFER ALI** and/or one of **JAFFER ALI's** workers.

34

65.    On April 19, 2013, **JAFFER ALI** was intercepted speaking with **Ashak WESA a.k.a. Antonio**.  **JAFFER ALI** told WESA that he needed "Bizarro" in Houston and requested 5,000 3.5 gram bags and 5,000 10 gram bags.  **JAFFER ALI** added that the wanted it "strong, 1 to 5."  WESA agreed.  Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe that Bizarro is a brand name of synthetic marijuana that **WESA** is manufacturing for **JAFFER ALI**. When **JAFFER ALI** referred to wanting if "strong, 1 to 5," he was referring to the ratio of chemical (UR-144) to acetone that is sprayed on the damiana and/or mashmallow.

66.    On April 20, 2013, **MOWLA** was intercepted calling **Amir Nabil Shaker SENADA a.k.a. Sam**.  During this conversation, **MOWLA** was giving an order for new product to **SENADA** and specified that he wanted the product made with "75% marshmallow and 25% Damiana" and the ratio at "1 to 7".  **MOWLA** said he would text the order and shortly thereafter sent the following text message to **SENADA**: "4000 red 1500blue 10g.  New improve aroma bag. 75% mars mellow 25% damiana. Cam 1to6 plz.bebe."  Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe that **MOWLA** was asking for 5,500 pieces of finished product made to his precise request.

67.    On April 21, 2013, **JAFFER ALI** was intercepted speaking with **Dung NGUYEN a.k.a. Alex**.  NGUYEN called to remind **JAFFER ALI** that NGUYEN was leaving that morning to go to China until April 29.  However, **NGUYEN'S** sister was staying behind, had keys to all the warehouses and would check to see if the "units" arrived the night before. **NGUYEN** also said that 50,000 Godfather bags had come in on Friday and his sister would have

them ready to deliver to **JAFFER ALI** on Monday. Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe that **NGUYEN** was going to China to speak with chemists there regarding new chemicals that could be used to manufacture the synthetic marijuana in order to circumvent the United States Controlled Substances laws.

68.     On April 22, 2013, **JAFFER ALI** was intercepted calling **Joshua Louis HASNESS a.k.a. Josh** who told **JAFFER ALI** that he (HASNESS) had "just dropped.....Super OG, Regular OG and Atomic." Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe **HASNESS** is a chemist in the Houston, Texas, area producing numerous brand names of synthetic narcotics of which he sells to **JAFFER ALI** on a regular basis. **HASNESS** appeared to have just delivered an unspecified amount of synthetic marijuana to a storage unit belonging to **JAFFER ALI.**

69.     On April 25, 2013, **Muhammad JAFFER ALI** was intercepted calling his wife, **Salma JAFFER ALI. Muhammad** was driving to San Antonio at the time of this conversation and anticipated arriving home around 1:00 A.M. During the conversation, **Salma** asked if **Muhammad** had "spoken to" **MOWLA. Salma** wanted to know if **MOWLA** "changed his money orders." **Muhammad** stated he could give **MOWLA** "a signed check to withdraw money" but that **Muhammad** would look into the "money situation tomorrow." **Muhammad** went on to say that he (**Muhammad**) has "money orders for $5,700 and a couple of checks totaling $6,000."

70. Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I know that when **Salma** asked if **Ashek** "changed his money orders" that she wanted to know if **Ashekul MOWLA** exchanged an unspecified number and/or amount of money orders for cash at various locations. The DTO is known for accepting blank money orders as payment for synthetic narcotics. This then requires members of the DTO, primarily **Salma** and/or **MOWLA**, to go to various banks and other financial institutions or their associates to cash the money orders. I believe that **Muhammad** and **Salma** sit down when **Muhammad** is in town and go over the financial records which they must maintain with the volume of product constantly coming in and going out to so many different locations and/or people.

71. On April 27, 2013, **MOWLA** was intercepted calling **Yong CHONG**. **MOWLA** told **CHONG** that he (**MOWLA**) had "3,400 coming" and "2,000 more" would be available Monday. **CHONG** comments that the "pineapple is slow" but that the "red one" is the one selling the most, "my customers are all red." **CHONG** asked "you will leave it over there in 34?" **MOWLA** acknowledged. Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe when **CHONG** referred to "34" that he was in fact referring to storage unit 534 at A-AAA Key Mini Storage, 5555 N.W. Loop 410, San Antonio, Texas. This unit is rented in **Derrick SANTILLAN's** name, but agents are aware that **MOWLA** pays the rent monthly in cash. **CHONG** is believed to have a key or keys to one or several of **MOWLA/JAFFER ALI's** storage units at this storage facility to allow CHONG to easily obtain product to distribute for the DTO.

37

72.     On April 27, 2013, **JAFFER ALI** was intercepted calling **Brian ARTHUR.**
**JAFFER ALI** asked if **ARTHUR** "had a chance to send the e-mail for the lab certificates."
**ARTHUR** said he would get it done.  During the conversation, **JAFFER ALI** and **ARTHUR**
began discussing the "strength" of the products.  **ARTHUR** stated if it is made "stronger than
there are going to be problems with the way it dissolves."  **ARTHUR** asked if **JAFFER ALI** has
seen "the PB and how sometimes there are little crystals."  **ARTHUR** went on to say "that is
what is going to happen when you try to make it stronger and then someone gets one of those and
it makes them, and we don't want to make anyone sick."

73.     Based on my training, experience, conversations with other agents involved in this
investigation, and my knowledge of this investigation in its totality, I believe **ARTHUR**, is
manufacturing synthetic narcotics for distribution in the Houston, Texas area.  When **JAFFER**
**ALI** asked about a "lab certificate" I believe he was asking for a "lab report" showing the
chemical breakdown of the product **ARTHUR** is selling.  Based on previous conversations as
noted in the affidavit, which **JAFFER ALI** has had with **ARTHUR**'s father, **Robert Daniel**
**ARTHUR,** I believe **JAFFER ALI** was expecting to get 2 lab reports per product, one to see
everything and one report which would be shown to law enforcement in an effort to avoid
interdiction action.  When **ARTHUR** said if he made "stronger than there are going to be
problems with the way it dissolves" I believe that he (**ARTHUR**) was saying that if too much
chemical, which comes in a powder form, was used to make the solution which is sprayed on the
base product, that the chemical will not dissolve properly in the acetone and form crystals.  I
believe **ARTHUR** was saying that the crystal can be the cause of users getting sick.  **ARTHUR**

38

and **JAFFER ALI**'s conversation regarding the PB-22 forming crystals and making people sick shows their knowledge of human consumption.

74.     On April 30, 2013, **MOWLA** was intercepted calling **Yong CHONG**. **MOWLA** asked **CHONG** if he could "open a storage room here I want to put more stuff today, on your name." "Not at the Evers one, do a different place, Vance Jackson or any place, open 2 small, 2 of them. I pay the money no problem, every month I pay on my credit card. Only 2 months needed. Don' tell them anything, just get 2 of them, one 5x5 and one 5x10." **CHONG** asked "what about the same place, no?" **MOWLA** replies "same place I have about, I have 6 or 7 of them. Over there we are going to put the Klimax in different place. There I give you a key but I pay its mine." **CHONG** says "ok" and agrees to go the next morning to rent the units. Agents learned that on May 2, 2013, **CHONG** rented units 250 (a 5x15) and 502 (a 5x10) at A-AAA Key Mini Storage, 6604 N.W. Expressway, San Antonio, Texas. However, **MOWLA** paid cash for the rental. On May 4, 2013, **MOWLA** was intercepted talking with **JAFFER ALI** about a "new place" near Vance Jackson and I-10, where **MOWLA** was dropping off some "stuff."

75.     On May 1, 2013, **MOWLA** was intercepted calling **Gulzar DHARANI a.k.a. Gloria**. **MOWLA** told **DHARANI**: "I told you to deposit everyday four or five thousand remember?" "Not in one day, because the same name, that's why I try to do three or four thousand every day." **DHARANI** said "ok, I will do it today, don't worry." **MOWLA** said "yeah, three, four, three, four, don't put five. I think money orders, that's why...everyday I think is better."

76.     Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I know **DHARANI** owns and operates at least five (5) convenience stores in San Antonio: Gloria's Food Mart, Anam Food

39

Mart, Fort Sam Grocery, Hildebrand Grocery and Ray Bon Grocery. In addition to selling synthetic marijuana supplied by **MOWLA**, **DHARANI** is believed to be assisting **MOWLA** and the DTO in laundering their drug trafficking proceeds through her business accounts. **MOWLA** and **JAFFER ALI** are known to receive blank money orders as payment for synthetic narcotics. Therefore, the money orders need to cashed and **DHARANI** is believed to be assisting that process through the use of bank accounts associated with her stores. I believe **MOWLA** is instructing **DHARANI** on the best practice to use when cashing/depositing the money orders in an effort to not appear suspicious to the banks.

77. On May 4, 2013, **JAFFER ALI** was intercepted calling **Joshua HASNESS**. **HASNESS** asked if it would be ok if he (**HASNESS**) would "drop off 1 today" and bring "the rest tomorrow." **JAFFER ALI** said that would be fine and they (**HASNESS** and **JAFFER ALI**) agreed to meet in one hour. At approximately 7:23 P.M., **HASNESS** called **JAFFER ALI** to confirm the meeting location. **JAFFER ALI** stated they would meet at his (**JAFFER ALI**) "warehouse." At approximately 7:43 P.M **JAFFER ALI** called **HASNESS** to confirm his (**HASNESS**) location. **HASNESS** indicated he was at the "storage unit." **JAFFER ALI** stated he (**JAFFER ALI**) was "waiting at the warehouse." **HASNESS** asked to confirm the address of the warehouse and **JAFFER ALI** replied "9811" Harwin.

78. Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe that when **HASNESS** asked if he could "drop off 1 today" and bring "the rest tomorrow" that he (**HASNESS**) was delivering approximately 1,000 pieces of synthetic marijuana but that it was only a portion of an amount requested by **JAFFER ALI** and that **HASNESS** would deliver the

40

remaining amount the next day. I also believe that after delivering the packages to an unspecified storage unit utilized by **JAFFER ALI** that **HASNESS** went to 9811 Harwin, Houston, Texas, which is believed to be a warehouse recently rented by **JAFFER ALI** to possibly utilize as a novelty wholesale business from where I believe **JAFFER ALI** will sell synthetic narcotics.

79. On May 4, 2013, **JAFFER ALI** was intercepted receiving and sending the following series of text messages to and from **Brian ARTHUR**: "If I need titanic 50000 what best price for me?" **ALI** responded "What gram packages?" **ARTHUR** wrote back "2Gr" and **ARTHUR** responded "$2.30. Or 2.10 if you provide printed bags. That price is good foor any quantity between 5000 and 1 million."

80. Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I know that **JAFFER ALI** had been speaking and texting for **ARTHUR** trying to negotiate lower prices for the products **JAFFER ALI** was buying from **ARTHUR**. This text message was **ARTHUR's** response letting **JAFFER ALI** know that no matter the quantity of wholesale product he purchased the price was the same. **ARTHUR** was saying that no matter how many packages of synthetic marijuana **JAFFER ALI** purchases from him **JAFFER ALI** would pay the same price. The only difference was whether **JAFFER ALI** provided the printed bag. If **JAFFER ALI** provided **ARTHUR** with the printed bags, the cost of the product would be $2.10 per 2-gram bag. If not the product was $2.30 per bag.

81. On May 12, 2013, **MOWLA** was intercepted receiving a call from **Prasanta BARDHAN**. **BARDHAN** told **MOWLA** that **BARDHAN** called **JAFFER ALI** recently but

couldn't understand what **JAFFER ALI** was saying. **MOWLA** told **BARDHAN** to ask **JAFFER ALI** for Classic Klimax and red Klimax. **BARDHAN** mentions having "Mohashin" bring product for **BARDHAN** "that it is pretty good and cheap. Mohashin had a customer taste it and the customer said it was good." **BARDHAN** comments that his house is "filled with this product." Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe **MOWLA** was telling **BARDHAN** to have **JAFFER ALI** supply even more synthetic marijuana products to **BARDHAN** to distribute. When **BARDHAN** referred to "Mohashin" I believe he was referring to Mohashin Sarker. On June 4, 2013, **BARDHAN** accompanied Sarker recently to the rental office of A-AAA Key Mini Storage at 5555 N.W. Loop 410, where **BARDHAN** has been renting unit 243 (10x10) since March 27, 2012. Even though the new unit, #80 (10x15), was rented in Sarker's name, according to A-AAAKey management, **BARDHAN** paid the rental fees. Sarker's address on the rental agreement is 6400 Wurzbach Road, the same as **BARDHAN**. The agreement also listed **BARDHAN** as the emergency contact. **BARDHAN** flew to Bangladesh, his home country, on June 12 and has a return flight scheduled for June 24. Between June 10, 2013 and June 12, 2013 the units were accessed six times, the last of which being June 12, 2013 at 9:12 a.m..

82. On May 16, 2013, **JAFFER ALI** was intercepted receiving a call from **Luz Abril GARCIA**. **GARCIA** told **JAFFER ALI** that "Antonio's brother" brought about "10 pieces of Klimax" to the store. **GARCIA** wanted to know if she could "save" the pieces for her "regular customers." **JAFFER ALI** said that was fine and to get "feedback" from the customers. I believe **GARCIA** was stating that if she gives her regular customers the first opportunity to try

42

the new product she is much more likely to get the feedback that **JAFFER ALI** wants/needs to determine if this product should be kept or replaced.

83. On May 16, 2013, **JAFFER ALI** was intercepted receiving the following text message from **R. Dan ARTHUR**: "Jeff, New law goes in effect today banning UR144 that most products contain, but our stuff uses 5F PB-22 which is not on the banned list, so let me know if you need anything."

84. Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I know that **Dan ARTHUR** was referring to the recent addition of UR-144, AKB48 and XLR11 to the Schedule I Controlled Substance Act. **ARTHUR** wanted to say that their products are legal to sell since they contain the chemical 5F PB-22. In fact, 5F PB-22 is considered a controlled substance when knowledge of human consumption can be proven, as is the case here. Previously on April 22, 2013, **JAFFER ALI** and **ARTHUR** were intercepted in a conversation regarding the customers complaining that the "flavor and ratio" "being no good."

85. On May 17, 2013, **JAFFER ALI** was intercepted calling **Brian ARTHUR**. **JAFFER ALI** asked to meet with chemist **Brian ARTHUR** at **ARTHUR's office** or somewhere. **ARTHUR** appeared busy and caught off guard by **JAFFER ALI's** request, but **JAFFER ALI** said he just needed 15 or 20 minutes "to learn something" from **ARTHUR**. **JAFFER ALI** asked **ARTHUR** to text his address to **JAFFER ALI**. Two minutes later **Brian ARTHUR** sent the following text message to **JAFFER ALI**: "3801 polk". As noted earlier in this affidavit, agents are aware that 3801 Polk Street in Houston is the address of Super Happy Fun Land, an experimental electronic music, underground jazz and outsider art venue owned

43

and/or managed by **Brian ARTHUR**. It is also the address for Herbal Mysteries which is the company name included on a AIBioTech lab report sent to **Brian ARTHUR** regarding the analysis of his synthetic marijuana products Top Shelf, Titanic and Blue Vortex. Later that evening, **JAFFER ALI** went back to meet **ARTHUR** at 3801 Polk Street for the purpose of picking up an order for 7,000 pieces of synthetic marijuana **JAFFER ALI** had ordered from **ARTHUR**. When **JAFFER ALI** was on his way to the location, **ARTHUR** commented he would call the "warehouse" to have someone bring **JAFFER ALI's** order saying it would be there in ten minutes. 3801 Polk Street appears to be **ARTHUR's** primary office with his manufacturing site within 10 minutes of that location.

86.    On May 17, 2013, **MOWLA** was intercepted coordinating with **WESA** for the delivery of finished products to **MOWLA's** new storage facility, A-AAA Key Mini Storage, 6604 N.W. Expressway, San Antonio. Surveillance agents later observed S.C. arrive at the facility and place boxes in unit 502.

87.    On May 19, 2013, **MOWLA** was intercepted calling **Prasanta BARDHAN**. **MOWLA** told **BARDHAN** that he wanted to show him Klassic. **MOWLA** stated that he is on the highway near Evers, and has it stored somewhere nearby. **BARDHAN** said he would be home all day and **MOWLA** replied he would "bring 50" to **BARDHAN's** house. Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe **MOWLA** wanted to show **BARDHAN** the synthetic marijuana brand Klassic made most likely with new chemicals. **MOWLA** is believed to have delivered 50 pieces of the product to **BARDHAN's** apartment, 6400 Wurzbach Road #2108, San Antonio, Texas.

44

88.     On May 20, 2013, **JAFFER ALI** was intercepted calling **David PUCEK**. **PUCEK** and **JAFFER ALI** were discussing an unknown male (UM) not being able to "bring PB into Florida or Georgia" anymore as "it's illegal." **PUCEK** said the UM "does have AB" if **JAFFER ALI** wanted it but that it was "kinda high." **PUCEK** commented that "supposedly the AB is better than the PB stuff." **JAFFER ALI** asked the price and **PUCEK** said "$2,600.00." **JAFFER ALI** said "tell him 10 AB" and we'll "see how it is." **PUCEK** thinks the UM has **JAFFER ALI's** money from the "leftover five FPB" that UM did not supply. **PUCEK** will have the UM apply that money to this purchase and see how much is left. **JAFFER ALI** said "no problem." At approximately 2:29 P.M., **PUCEK** sent the following text message to **JAFFER ALI**: "So with your 13600 credit those 10 cost 26000.. so he needs u to deposit 12400. Cool?" Then at approximately 3:43 P.M. **PUCEK** sent the following text message to **JAFFER ALI**: "Send me address in next five minutes and he will send today." At approximately 4:04 P.M., **JAFFER ALI** sent the following text message to **PUCEK**: "Josh luis 18062 Fm 529 number 258 Cypress TX 77433."

89.     Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe **PUCEK** was telling **JAFFER ALI** that the UM who supplied the chemicals used to manufacture the synthetic marijuana, i.e. PB-22 and 5F-PB-22,[2] are now banned substances in the states of Florida and Georgia, therefore the UM was not importing the chemicals from China to those states where UM has a network of drop locations established. When **PUCEK** mentioned "AB being better than PB" I believe he was referring to the newest chemicals being used, referred to as "AB," are

---

2 PB-22 is an analogue of JWH-018, a Schedule I Controlled substance. 5F-PB-22 is an analogue of PB-22. As such, when intent of human consumption is shown, PB-22 and 5F-PB-22 are considered controlled substances on a federal level.

stronger chemicals and are said to give the user of the end product a stronger effect. In the subsequent text messages, **PUCEK** was saying that **JAFFER ALI** had a credit with the UM of $13,600 due to **JAFFER ALI** previously depositing money for the 5F-PB-22 that was never sent by the UM due to the state ban. The AB cost $2,600 per kilogram and **JAFFER ALI** ordered 10 kilograms, therefore, after applying the credit, **JAFFER ALI** only needed to deposit $12,400 to pay for the 10 kilograms of the AB. The address provided is believed to be associated with chemist **HASNESS**.

90.    On May 21, 2013, **MOWLA** was intercepted calling K.H. who appears to be located in Bangladesh. **MOWLA** confirms that he received 2 text messages regarding $8,000 and $5,500 and that **MOWLA** will "send that" in a few moments. **MOWLA** told K.H. to "keep it for now" and **MOWLA** will tell K.H. later "where it will go." Prior to the call **MOWLA** received text messages containing bank account information and the above referenced dollar amounts. **MOWLA** frequently receives this type of text messages. Later that day **MOWLA** was again intercepted receiving a call from K.H. **MOWLA** confirmed that the deposits had been made in two different accounts at two different banks. Agents believe **MOWLA** went to two different banks to make the deposits because he was afraid he would raise the suspicion of bank employees. A trash run was completed on May 22, 2013, at **MOWLA's** residence. Included in the documents retrieved from the trash were numerous bank deposit slips from various banks, several of which included the name "Kabir" hand-written on the top of the slip. Agents believe that **MOWLA** wrote the names on the slip so he would remember to what each deposit pertained. Agents further believe that **MOWLA** is moving his drug trafficking proceeds to Bangladesh through this method, all deposits are made in amounts below $10,000.00, to avoid seizure by U.S.

46

law enforcement.   The deposits were made between January 14, 2013, and May 13, 2013, and totaled $321,125.05.

91.   On May 22, 2013, **JAFFER ALI** was intercepted calling N.K., owner of a retail store in Dallas, Texas.   **JAFFER ALI** placed N.K. on a 3-way call with **Abu Mohammad Mafttah UDDIN a.k.a. Paul** who runs Hang Ten Smoke Shop in San Antonio, Texas.   N.K. provided his e-mail address but **UDDIN** had a hard time understanding N.K.   **JAFFER ALI** then told **UDDIN** to give N.K. **UDDIN's** telephone number so that N.K. could text his e-mail address to **UDDIN**.   **UDDIN** stated that he lost his telephone but provides the number for another employee so that N.K. could send the address.   **JAFFER ALI** told **UDDIN** to e-mail "all the new ones I gave you" when he received N.K.'s e-mail address.   Shortly thereafter, N.K. sent a text message to **JAFFER ALI** that included N.K.'s email address.   Later, N.K. sent the following text message to **JAFFER ALI**: "Did u send email."   **JAFFER ALI** then forwarded N.K.'s text message that contained his e-mail address to the telephone number provided by **UDDIN**.

92.   Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe that **JAFFER ALI** provided **UDDIN** with lab reports for new synthetic marijuana products which **JAFFER ALI** supplied to Hang Ten to sell.   I further believe that N.K., who owns a retail store in Dallas, Texas, was also being supplied synthetic marijuana products by **JAFFER ALI** and that N.K. was wanting the lab reports which show which chemicals where or where not utilized in manufacturing the product.   As noted above, agents are aware that there are typically two reports for each product.   One report shows the all the chemicals (legal or not) that are contained in the

47

product.  The other report is intended to be shown to law enforcement and this report shows the product to not contain any controlled substance.  Agents intend to request a search warrant for N.K.'s e-mail address in an attempt to capture the documents sent to N.K. by **UDDIN**.

93.      On May 24, 2013, **David PUCEK** was intercepted speaking with **JAFFER ALI**. **PUCEK** and **JAFFER ALI** discussed making deposits.  **JAFFER ALI** said that he made "2, 95, one yesterday and one today" and could make "a 9 today."  **PUCEK** said he would have "him" send "15 ABF" to **JAFFER ALI**.  Based upon my training, experience, and conversations with other agents involved in this investigation, I believe **PUCEK** noted the two $9,500 deposits **JAFFER ALI** had made as well as the $9,000 he was going to make that day.  I believe that these deposits were made in amounts less than $10,000 at different banks in order to avoid having to fill out Currency Transaction Reports with banks.  Based on those deposits I believe **PUCEK** was having a chemical supplier ship 15 kilograms of AB-Fubinaca to **JAFFER ALI**.

94.      On May 26, 2013, **JAFFER ALI** was intercepted receiving a call from **Dung NGUYEN a.k.a. Alex**.  **NGUYEN** told **JAFFER ALI** that he (NGUYEN) had "dropped stuff off" to **JAFFER ALI**'s storage.  **NGUYEN** went on to say that he only saw one box of Master Kush and wanted to know if **JAFFER ALI** wanted him (NGUYEN) to make more.  **NGUYEN** commented that he could "make all new" and "put "new" on it."  **JAFFER ALI** agreed to start making the "new" products.  Based upon my training, experience, and conversations with other agents involved in this investigation, I believe that the "new" refers to utilizing an AB chemical, either AB-Fubinaca or AB-Pinaca.

95.      On May 27, 2013, **JAFFER ALI** was intercepted receiving a call from **Syed ALI**. **ALI** stated he wanted "200" of "Kisha Cole" in 10 grams.  **JAFFER ALI** replied that he only

48

had "them in 3 grams" and "have 100 pieces." **JAFFER ALI** offered that he had "Angry Bird in big size." **ALI** said to give him "200 pieces." Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I know that when **ALI** owns Smokers Galaxy in San Antonio and is believed to be ordering synthetic marijuana products to be distributed from his store. "Kisha Cole" and "Angry Birds" are brand names of synthetic marijuana distributed by **JAFFER ALI.** 3 grams and 10 grams are common weights these products are packaged in for sale.

96.     On May 29, 2013, **MOWLA** called A.R.K. **MOWLA** said "you need Klimax, 1,000 pieces red ones?" A.R.K. acknowledged. **MOWLA** requested that A.R.K. come pick up the product at Evers at 4:30 P.M. A.R.K. agreed. Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I know that A.R.K. is co-owner of Smoker's Galaxy in San Antonio, Texas. A.R.K. is acknowledging that he will pick up 1,000 pieces of Klimax from Best Foods #2 at 5403 Evers Road. Surveillance units observed a tan colored Toyota Minivan arrive at Best Foods #2 bearing Texas license plate TKR-298, which is registered to A.R.K.. A.R.K. was observed placing a bag inside the vehicle prior to departing.

97.     On May 29, 2013, **JAFFER ALI** was intercepted receiving a call from **Irma ZERTUCHE-Santillan**. **ZERTUCHE-Santillan** told **JAFFER ALI** "the guy already left" and that she had found the "Scooby" and had given it to the UM. **ZERTUCHE-Santillan** said "the other 2 orders are ready" and that she also found "100 of the hypnotic." **JAFFER ALI** then commented that something "might be at the other one, number 52" and that they would "check there later." **ZERTUCHE-Santillan** asked if someone else was "coming or not." **JAFFER**

ALI said to give him 5 minutes and he would confirm, if not **ZERTUCHE-Santillan** could go to the hotel and get some rest.

98. Based upon my training, experience, and conversations with other agents involved in this investigation, I believe **ZERTUCHE-Santillan** is at a storage facility in Houston, Texas, and assisted one of **JAFFER ALI's** buyers in taking receipt of an unknown amount of synthetic marijuana. When **JAFFER ALI** referred to "number 52" I believe he was referring to storage unit #52 at Great Value Storage, 9951 Harwin Drive, Houston, Texas

99. On May 30, 2013, **JAFFER ALI** was intercepted calling **David PUCEK** and completing a three-way call including chemist **HASNESS**. **HASNESS** was complaining of problems he was experiencing when trying to work with the AB-Fubinaca they had recently received. **HASNESS** told **PUCEK** "see if there is an extra step to the process or something like that, but it was the strangest thing it happened within seconds of adding the acetone, it was like it just all turned to cream cheese." **PUCEK** asked "did you use a full kilo or how much did you use?" **HASNESS** responded "I used a full one." **PUCEK** then asked "and then how much acetone do you mix with it?" **HASNESS** answered "well I used one full gallon and then it turned in to cream cheese then I added another half on top of that to try...it turned in to large chuncks...now it's a slurry and just not working." **PUCEK** said he would "call him" because "I don't' mix it" but he would call and get back with **HASNESS**.

100. Based upon my training, experience, and conversations with other agents involved in this investigation, I believe **HASNESS** began using the new chemical, AB-Fubinaca because they (**JAFFER ALI, HASNESS** and others involved in synthetic cannabinoids) believevde it skirts the law and is not considered illegal to use. However, **HASNESS** was not getting the chemical

50

to mix properly and was therefore not able to use it. I believe **PUCEK** shows he is very familiar with how the damiana, marshamallow, and chemicals he is involved with are used in the manufacturing of illegal controlled substances.

101. On May 30, 2013, **MOWLA** was intercepted receiving a call from **Yong CHONG**. **CHONG** told **MOWLA** that he (**CHONG**) needed "200 Supreme" and asked if "it is in the storage room?" **MOWLA** said "in the same box." **MOWLA** said for **CHONG** to take what he needed and "write down how many" **CHONG** took. Based upon my training, experience, and conversations with other agents involved in this investigation, I believe **CHONG** was going to take receipt of 200 pieces of Supreme from a storage unit at A-AAA Key Mini Storage, 5555 N.W. Loop 410, San Antonio. When **MOWLA** instructed **CHONG** to "write down how many" I believe **MOWLA** maintains written records inside the storage units to maintain as accurately as possible the amount of inventory they have and who owes what amount of money.

102. On May 31, 2013, **JAFFER ALI** was intercepted conducting a three-way call with H.S., a synthetic marijuana supplier from Orlando, FL and Chris LNU, a chemist from Austin Analytical, a private laboratory in Austin, Texas. **JAFFER ALI** got H.S. on the line and told H.S. that Chris LNU is going to go over the lab results that Chris LNU sent to **JAFFER ALI** to determine the legality of the components of various products **JAFFER ALI** sent to the lab. Chris LNU starts off saying that Orgazmo, Angry Bird, Nutronium, 7H Hydro and Klimax are all "illegal." Hearing this H.S. told **JAFFER ALI** to put the products to the side and H.S. would swap them out. The next evening, **JAFFER ALI** was intercepted talking with his wife, **Salma JAFFER ALI**. **Salma** asked about Orgasmo and **Muhammed JAFFER ALI** said the "lab report was not good." **Luz Abril GARCIA** then got on the phone. **JAFFER ALI** instructed

her to not sell Orgasmo, Neutrum, 7H or Angry Birds because the lab reports were not good. Four days later, on June 5, 2013, even after **JAFFER ALI** was told the product contained a controlled substance, a DEA CHS purchased a 10-gram Orgazmo strawberry Zencense package from Hang Ten Smoke Shop for $40.00.

103. On June 4, 2013, **JAFFER ALI** sent the following text message **Irma Zertuche-SANTILLAN a.k.a. Nathaly, a.k.a. Natalie**: "I need your help in Houston". The following string of responses were exchanged between **JAFFER ALI** and **Zertuche-SANTILLAN:** "Howmany days ??" "Two days" "OK tomorrow at what time ??? I'll take anything from here ?" "I let you know." "OK."

104. Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I know that **Zertuche-SANTILLAN** is involved in the transportation of synthetic narcotics at the direction of **JAFFER ALI.** I believe **JAFFER ALI** wanted **Zertuche-SANTILLAN** to drive from San Antonio to Houston possibly transporting synthetic narcotics and then to assist **JAFFER ALI** in moving synthetic narcotic products between various storage units **JAFFER ALI** rents in Houston.

105. On June 4, 2013, **MOWLA** called his wife, T.B. **MOWLA** asked "how is the money counting going?" T.B. responded "still counting." **MOWLA** tells T.B. he will pick up the kids and drop them off at home. T.B. replies "Oh that would be good. Then I can count the money peacefully." **MOWLA** asked "What did you count? How much?" T.B. asked "How much did I count?" **MOWLA** said "yes." T.B. stated "Four days remaining." **MOWLA** stated "tell me the last month's total in short term. Last month, how much is it all together?"

52

T.B. answered "That I haven't made the total yet." **MOWLA** said "After you do the total, 10,000 or 20,000, just say if it's 10 then 10, if it is 20 then 20."

106.    Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe T.B., **MOWLA's** wife, was counting U.S. currency, possibly at Hang Ten Smoke Shop. When T.B. said "still counting" and "can count the money peacefully" it indicated that there was a large amount of money. If this money represented legitimate sales from Hang Ten, it would be common practice for a business to conduct regular cash deposits into a bank account versus leaving it at the store to be counted on a monthly basis. When **MOWLA** instructed T.B. "if it's 10 then 10, it is 20 then 20" he was telling her to speak in coded language, which is not how legitimate business owners would typically discuss their finances. I believe this money represents the proceeds of the sale of synthetic marijuana sold from Hang Ten, which I believe is maintained separately in the store, possibly in a safe.

107.    On June 6, 2013, **JAFFER ALI** was intercepted receiving a call from H.S. H.S. told **JAFFER ALI** that H.S. will have "two shipments" "going to two different locations" and that SINGH will send **JAFFER ALI** the "tracking numbers." H.S. then asked how much money did **JAFFER ALI** "deposit yesterday." **JAFFER ALI** replied "6150." H.S. asked **JAFFER ALI** to make "three more deposits" "of 6140" in "Chase." After these deposits H.S. will have **JAFFER ALI** use "Wells Fargo." H.S. commented that **JAFFER ALI's** "balance due is 19,700" and that H.S. needed **JAFFER ALI** to make the deposits because H.S. needed to "pay somebody else."

53

108.  Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe that H.S. was shipping synthetic marijuana products to two different addresses previously provided by **JAFFER ALI**. I believe H.S. and **JAFFER ALI** then structured deposits being made by **JAFFER ALI** into bank accounts provided by H.S. to pay the $19,700 owed by **JAFFER ALI** for synthetic marijuana supplied by H.S..

109.  On June 6, 2013, **JAFFER ALI** was intercepted calling **Faizan ALI**. **JAFFER ALI** asked if **ALI** was at the "new location or the other one." **ALI** said he was at "Harry's." **JAFFER ALI** said he would "come over." **ALI** said he was looking for more "bags" and that he had "unloaded the merchandise" and "put it up." **JAFFER ALI** asked for **ALI** to "text the number for the gate there." Shortly thereafter, **JAFFER ALI**, received the following text message: "21579700."

110.  Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe **JAFFER ALI** was asking if **ALI** was at a new storage location they recently began using in Houston or possibly storage units at Great Value Storage where they have maintained units for some time. When **ALI** said he was at "Harry's," I believe he was referring to a location associated with an unknown male named "Harry." I believe **ALI** received merchandise that he had placed in a storage unit and he may have been looking for empty bags, which he would then provide to a chemist to package with new product. The text message sent by **ALI** appears to be the code **JAFFER ALI** would need to enter to gain access to **ALI's** location.

54

111. On June 6, 2013, **MOWLA** was intercepted receiving a call from **Mafftah UDDIN**. During the conversation, **UDDIN** advised **MOWLA** that he had an order for "the old stuff." **MOWLA** questioned what **UDDIN** was speaking in reference to and **UDDIN** replied "old Klimax." **MOWLA** acknowledged.

112. Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe that **Mafftah UDDIN** was referring to an order for synthetic marijuana manufactured with chemicals that were currently banned. The DTO routinely used "old" to describe products that were produced before the most recent Federal Ban.

113. On June 8, 2013, **JAFFER ALI** was intercepted calling **Syed ALI**. During the conversation **JAFFER ALI** advised that several individuals had been in trouble with law enforcement lately. **Syed ALI** advised that the best thing to do is "lay low and not get noticed."

114. Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality I believe that **JAFFER ALI** and **Syed ALI** are making reference to several recent arrests made by law enforcement, in the Texas area, in regard to synthetic marijuana.

115. On June 8, 2013, **JAFFER ALI** was intercepted calling **Syed ALI**. During the conversation **Syed ALI** questioned if UM was manufacturing product. **JAFFER ALI** advised that UM currently wasn't because things were "hot." **Syed ALI** advised that people sell the product openly in Austin but **Syed ALI** is not sure how they are able to. **Syed ALI** advised that 3 law enforcement officers came to his store in regard to a complaint of the sell of Klimax. **Syed**

55

ALI advised that the lab certificate "saved" him. **JAFFER ALI** requested that **Syed ALI** retain the officer's name if that occurs again.

116. On June 7, 2013, **MOWLA** was intercepted receiving a call from **Gluzar DHARANI a.k.a. Gloria**. **MOWLA** told **DHARANI** that he now had Diablo and was going to bring it to her in 30 minutes. **DHARANI** asked **MOWLA** how much she "owed" **MOWLA** from the "money orders" several weeks ago. **MOWLA** said he had it written down, papers could be heard in the background being moved around. **MOWLA** replied "$5,300." **DHARANI** said she had the money and would pay **MOWLA** when he brought the Diablo. **MOWLA** asked if she needed any other products. **DHARANI** said to bring her "100 mix and match." Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe when **DHARANI** asked how much she "owed" from the money orders that she was referring to **MOWLA** haven given her blank money orders the DTO receives often as payment for synthetic narcotic products for her to launder through her business accounts. When **MOWLA** said he had it written down and then gave her the exact number I believe he maintains written records of his financial activities related to the DTO.

117. On June 10, 2013, **Faizan ALI** was intercepted calling **JAFFER ALI**. **ALI** told **JAFFER ALI** to send "Anthony's girl to storage #52." **JAFFER ALI** said "okay." A short time later **ALI** called back to **JAFFER ALI** and asked "what happened." **JAFFER ALI** stated he was trying to call "her" but she wasn't answering. **JAFFER ALI** placed **ALI** on hold and spoke with S.C. on the other line. S.C. said she was looking for the warehouse. **JAFFER ALI** told her a "guy will be there" and that she would "unload the stock in to #52 or #24" and possibly

move the items in #24 to #52, whatever they thought was right. Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I know that S.C. transports synthetic narcotics between San Antonio and Houston on a regular basis at the direction of chemist **Ashak WESA a,k.a. Antonio**. S.C. was delivering unspecified synthetic marijuana products manufactured by **WESA** to **JAFFER ALI** and **JAFFER ALI** was having S.C. and **ALI** store the items at Great Value Storage in either unit #52 or #24.

118. On June 10, 2013, **Ashekul MOWLA** was intercepted calling **Mafftah UDDIN**. During the conversation, **MOWLA** questioned if **Derrick SANTILLAN** had been rolling cigarettes with the "incense" sold at Hang Ten. **UDDIN** acknowledged that **SANTILLAN** had. **MOWLA** replied that **UDDIN** knew that was illegal and **SANTILLAN** should be warned against the behavior. **UDDIN** advised that **SANTILLAN** had only done it once.

119. Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe that **MOWLA** was utilizing his remote access to surveillance cameras to view what was occurring at Hang Ten. **MOWLA** observed activity consistent with **SANTILLAN** using the product sold as "incense" at the location to fill a cigarette. This is a common method for user(s) to ingest synthetic marijuana. **MOWLA** knowing the act was illegal cautioned **UDDIN** in allowing that inside of the store. **UDDIN** acknowledged.

120. On June 12, 2013, **David PUCEK** was intercepted calling **JAFFER ALI**. During the conversation **PUCEK** told **JAFFER ALI** "so I got the marshmallow in today, do you want me to ship it off to you?" **JAFFER ALI** responded "yeah, to the Houston terminal." **JAFFER**

57

ALI then asked "so is there more coming?" **PUCEK** stated he had 4,000 more coming in next week and asked if **JAFFER ALI** wanted "this 1,000 and the other 4,000?" **JAFFER ALI** replied yes.

121.   On June 12, 2013, **JAFFER ALI** was intercepted calling **Luz Abril GARCIA**. **JAFFER ALI** asked **GARCIA** "how sales are going?" **GARCIA** responded "$800 in the morning and in the evening $1,200." **JAFFER ALI** then begins asking the response **GARCIA** is getting from the customers regarding various products. **GARCIA** says people are complaining about Pure Fire and Paradise, they do not like them. The red and green Klimax are good but Kush is giving people headaches. Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe **GARCIA** was telling **JAFFER ALI** that they sold $2,000 that day just in the sale of synthetic marijuana. Furthermore, when **GARCIA** and **JAFFER ALI** discuss customer reactions to the new products and **GARCIA** states that Kush is giving headaches, I believe this is another instance where she is acknowledging he knowledge of human consumptions even though the packaging says "not for human consumption" and they tell customers it is aromatherapy.

122.   On June 12, 2013, **MOWLA** was intercepted receiving a call from chemist **Ashak WESA a.k.a. Antonio**. During the conversation, **WESA** explained to **MOWLA** that his workers used the "new formula" yesterday and it was "very strong." **WESA** commented that the "3 guys that made it did not come to work today and that one of the guy's wife called at 2 AM and told" **WESA** that her husband was "hallucinating and talking to himself and today his eyes were really big and he keeps talking to himself." **MOWLA's** response was to ask **WESA** to make Klimax with "that mix" because he has a guy who orders 2,000 pieces every week but is not

ordering because he started getting Classic Klimax." Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe that **MOWLA** does not care the potential for harmful and fatal effects of these products and will continual ask for the product to be stronger and stronger in an attempt to make as much money as possible.

123. On June 16, 2013, **MOWLA** and **JAFFER ALI** were intercepted discussing their storage units at "Evers." **JAFFER ALI** asked **MOWLA** if the "storage units at Evers were full." **MOWLA** replied no there is a large amount of space. **MOWLA** commented that he attempted to get "Claudia" to help him rent another storage unit "over across the street of the mall" but that she was still in Kansas. **JAFFER ALI** asked if "Antonio's product" was in "250." **MOWLA** replied, not it is actually in "399." **JAFFER ALI** comments that the "new product" is in "281." Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe **JAFFER ALI** and **MOWLA** were referring to storage units 281 and 399 at A-AAA Key Mini Storage, 5555 N. W. Loop 410 and unit 250 at A-AAA Key Mini Storage, 6604 N.W. Expressway, San Antonio. All of the units are rented in names other than **JAFFER ALI** and/or **MOWLA**, however, they pay the rental and maintain control of the units. Not having their names on the units is a measure they take to try and distance themselves from the products inside. Unit 281 has been rented sing July 2, 2011, in the name of Oscar Moreno. "Jeff Ali (210)367-7058" is listed as the "Emergency Contact and as having authority to enter the unit. Unit 399 has been rented since July 28, 2012, in **Derek Ray SANTILLAN's** name. A-AAA Key management has advised that MOWLA personally pays the monthly fees for units 281, 399, 364, 436 and 534 in cash every

59

month. Unit 364 has been rented since August 2, 2012, in the name of R.C.R., S.M., and **JAFFER ALI** are listed as having authority to enter the unit. Unit 436 and 534 were rented on July 28, 2012 and September 8, 2012, respectively, in **Derek Ray SANTILLAN's** name.

124. On June 17, 2013, **MOWLA** was intercepted talking with **Derrick SANTILLAN**. **MOWLA** asked if anyone came in to buy wholesale. **SANTILLAN** said "yes, one of" **MOWLA's** friends who **SANTILLAN** had seen before. **MOWLA** instructed **SANTILLAN** to "not let anybody go in, not even Roger [PH], now you, me and Paul are only three or four people nobody else. **SANTILLAN** replied "I told him to come to the back because there was a bunch of customers in the store and he wanted to ask about the old stuff. I didn't want him to say any old stuff in front of customers you know, it was different customers that were in the store·too, not ·regulars. So that's why I told him 'hey, hey, shh, come over here.'" **MOWLA** reiterated not to "take anybody inside" because "selling the older stuff is very dangerous so now we have to be careful even if new or old, don't let anybody go inside even restroom, you know where restroom is a lot of things also." **MOWLA** went on to say "for your safety and for everybody's safety should not allow anybody because I have the older stuff, until we are out of that we have to be very careful." When **MOWLA** and **SANTILLAN** are referring to "the old stuff" I believe they are referring to having synthetic marijuana products which contain the now banned chemicals and **MOWLA** is storing several of them in the bathroom area at the Hang Ten Smoke Shop. They are very selective to whom they will sell these products too trying to avoid selling to an undercover law enforcement officer or an individual assisting law enforcement.

125. On June 18, 2013, **JAFFER ALI** was intercepted calling **Luz Abril GARCIA**. **JAFFER ALI** asked how "Tornado" was selling. **GARCIA** said it was "selling good, better

than Atomic." **GARCIA** went on to say that Tornado is "more, strong like Atomic, more, more strong." **GARCIA** said that they did not have any of the "Klimax red" and that people were requesting mango and "the other one." **JAFFER ALI** said he would get some later and call her back. Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe **GARCIA** was telling **JAFFER ALI** that the users of Tornado are experiencing a more intense reaction when they use Tornado than when using Atomic Bomb. Again this shows **GARCIA's** knowledge of human consumption of these products.

126. On June 18, 2013, **JAFFER ALI** was intercepted calling **Salma JAFFER ALI**. **Salma JAFFER ALI** advised **JAFFER ALI** that **Ashekul MOWLA** was going to deposit $20,000. **Salma JAFFER ALI** advised that she had $12,000 in cash. **JAFFER ALI** advised her to deposit $10,000 in a combination of checks and cash because a large deposit of cash would be questioned.

127. On June 18, 2013, **JAFFER ALI** was intercepted receiving a call from **Syed ALI**. During the conversation, the two discussed the different prices of known brand names of synthetic marijuana. **JAFFER ALI** and **SYED Ali** began to converse about the legality of selling synthetic marijuana. **JAFFER ALI** advised that "technically' it is not illegal. **JAFFER ALI** advised that he has an attorney attempting to ascertain previously seized product back from law enforcement. **JAFFER ALI** advised that the federal government would not get involved with seizures unless one is caught leaving a store with the product.

128. On June 19, 2013, **MOWLA** was intercepted receiving a call from **CHONG**. **CHONG** asked "how many Supreme, yellow, gold anything" did **MOWLA** have. **CHONG**

61

went on to say that "Klassic, blue" is "coming out in drug tests." **CHONG** asked where **MOWLA** had the Supreme. **MOWLA** said "same place, your place." **CHONG** said he was there yesterday and only saw 200 or 300 pieces. Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe **CHONG** needs to substitute Supreme for Klassic because people are starting to fail urinalysis when using Klassic. Many traditional drug users began using synthetic narcotics because the usage would not register on a urinalysis which may be given for employment purposes or even more often to individuals on probation. Many of the laboratories conducting the urinalysis are beginning to test for synthetic cannanabinoids and I believe this is what **CHONG** is referring to with **MOWLA**.

129. On June 19, 2013, **MOWLA** was intercepted receiving a call from **UDDIN**. During the conversation **UDDIN** suggested that Hang Ten place an ad in a local periodical. **MOWLA** replied that the idea was good but they would not place the ad because they are "selling Spice." **MOWLA** continued that it would not be smart to place the ad now.

130. On June 19, 2013, **MOWLA** was intercepted receiving a call from **UDDIN**. During the conversation **UDDIN** advised that he had received feedback from two customers in regard to Hang Ten's product "Klimax." **UDDIN** advised that the feedback was favorable. **MOWLA** questioned how the "strength" of the product was. **UDDIN** replied that it was good. **MOWLA** advised **UDDIN** to find out how to improve the product in reference to strength and flavor. **MOWLA** advised **UDDIN** to test the product more.

131. Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe that **MOWLA** and

UDDIN were discussing the level of intoxication the synthetic marijuana caused. Additionally, I believe that **MOWLA** instructed **UDDIN** to speak with customers and determine if the flavor when the product is smoke needed to be changed as well as if the product's intoxication level needed to be increased.

132. On June 21, 2013, **Muhammad JAFFER ALI** was intercepted calling **Salma JAFFER ALI**. **Muhammad** questioned if UM had come and received his order of 100 pieces **Salma** advised that UM had come by but the Evers store was out of product. **Salma** advised that she had not received any complaints from the customers in regard to the product. **Muhammad** advised that he had paid a lawyer $20,000 just in case of an "emergency" and would furnish the lawyers phone number to **Salma**.

133. On June 21, 2013, **MOWLA** was intercepted receiving a call from Yanick Last Name Unknown (LNU) an employee of Hang Ten Smoke Shop. Yanick explained to **MOWLA** "you got a climax out of it but I'm already pretty sober. It was pretty good but for me pretty short" like 18 minutes. **MOWLA** asked "stronger that the Classic?" Yankick replied "yeah stronger for me, I don't know how for Derrick, he's a constant smoker I'm not." MOWLA asked about the "taste." Yanick said yeah and potency was good but time wise is was short. MOWLA said "try it with more people." Yanick agreed. Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe Yanick and **Derrick SANTILLAN** consumed one of the new synthetic marijuana products being sold at the smoke shop and Yanick was explaining the physiological effects he experienced to **MOWLA**. Young kids could be laughing and playing in the background when Yanick was explaining his experience.

63

134.   On June 21, 2013, **MOWLA** was intercepted receiving a call from **Amir Nabil Shaker SENADA a.k.a. Sam**.   **MOWLA** and **SENADA** discussed arrangements for **SENADA** to have someone deliver finished product from **WESA's** lab to a storage unit.   **MOWLA** said "I have a key to 502 you have a key for it?"   **SENADA** says no, the key is with the girl, she is sick."   **MOWLA** says "ok if you don't have a key then I have to be there because no one has a key to 502 and 399."   **SENADA** said for **MOWLA** to call when he is available.   **MOWLA** said if the "stuff is good I am going to tell Antonio to raise come price but do more stronger I have to fuck people over."   **SENADA** replied "this one is stronger don't worry, I made it more stronger." Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe that **MOWLA** was referring to storage unit 502 at A-AAA Key Mini Storage, 6604 N. W. Expressway and unit 399 at A-AAA Key Mini Storage, 5555 N.W. Loop 410.   I believe the "girl" that is sick is S.C. who regularly delivers finished product to **MOWLA** and **JAFFER ALI's** storage units in San Antonio and Houston.   When **MOWLA** refers to the product needing to be "stronger" and wanting to "fuck people over," I believe he is again acknowledging the human consumption and his complete disregard for the safety of the user.

135.   On June 21, 2013, **JAFFER ALI** was intercepted calling **Salma JAFFER ALI**. **JAFFER ALI**.  **Salma JAFFER ALI and JAFFER ALI** discussed how business had been slow.  **Salma JAFFER ALI** advised that people are still selling product but are fearful of purchasing any new product.   She continued that many of the customers who previously patronized the Ever's store are now going to Hang Ten.   **Salma JAFFER ALI** advised that Hang Ten sells the product cheaper but Hang Ten currently does not have "AB."

64

136. Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe that **JAFFER ALI** and **Salma JAFFER ALI** were discussing the low level of sells for synthetic marijuana. AB is a known acronym for a popular brand name of a synthetic marijuana product "Atomic Bomb."

137. On June 22, 2013, **MOWLA** was intercepted receiving a call from his wife, T.B. T.B. accused **MOWLA** of "moving the money from two different places." She said **MOWLA** moved "Pabel's $2,500 and the bag of money from the store." **MOWLA** denied moving the money. **MOWLA** said he only placed the "bag of $20,000 under the glass." T.B. asked for the "bag full of money from the car." **MOWLA** said "from the black bag," he "only took one bag and placed it under the glass." She then asked about the money in the "armoire" and **MOWLA** said he didn't take it. **MOWLA** said T.B. is careless keeping money laying all over the house, she needs to count them all. **MOWLA** said he has found "a bundle of money when he was getting his pants then he found three or four more bundles at other places. **MOWLA** said she needs to gather all the money in one place. **MOWLA** commented that he put one of the bundles he found in a bucket next to the chest of drawers.

138. On June 22, 2013, **MOWLA** was intercepted receiving a call from his wife, T.B.. T.B. commented that she "found the money." She said she "took that money away from" her "money and placed it in a separate bag." **MOWLA** said he knew that is what she had done. **MOWLA** said T.B. has "money all over the place." T.B. thought **MOWLA** had taken the bag because he had moved "the other bag." Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I

65

believe large sums of U.S. currency representing proceeds of **MOWLA's** illegal drug trafficking activities are stashed around their residence located at 5623 Dhaka View, San Antonio, Texas.

## RESIDENCES

139.   15515 Portales Pass, Helotes, Texas, is the permanent residence of **Muhammad JAFFER ALI** and **Salma JAFFER ALI**.   This has been confirmed through physical surveillance cell site data for cellular telephones utilized by both **Muhammad JAFFER ALI** and **Salma JAFFER ALI** as well as ping data relating to **Muhammad JAFFER ALI's** cellular telephone assigned telephone number (210)838-4110.

140.   5623 Dhaka View, San Antonio, Texas, is the permanent residence of **Ashekul MOWLA** and his wife and children.   This has been confirmed through physical surveillance and the on-going use of a GPS tracker installed on **MOWLA's** vehicle and a pole-camera installed in the vicinity of the residence.

141.   91 Big Horn Canyon, San Antonio, Texas, is the permanent residence of **Syed ALI** and his family.   This has been confirmed through

142.   5562 Rangeland Street, San Antonio, Texas, is the permanent residence of **Yong Hwa CHONG**.   This has been confirmed through physical surveillance.

143.   6400 Wurzbach Road #2108, San Antonio, Texas, is the apartment permanent residence of **Prasanta BARDHAN**.   This has been confirmed through physical surveillance.

## UNDERCOVER BUYS

Law enforcement agencies participating in this investigation have conducted controlled purchases of various brands of synthetic narcotics at the following locations:

**Best Foods #2** (5403 Evers Road, San Antonio, Texas),

66

owned by **Muhammed JAFFER ALI** and **Salma JAFFER ALI**;

| | |
|---|---|
| 10/16/12: | DEA, 1 package Gorilla Dro Po-Po and 1 4-gram package of OMG |
| 10/16/12: | CS, 1 3-gram package of Mr. Nice Guy Sour Apple Vintage |
| 02/07/13: | FBI, 92 packages of Klimax, Scooby Snax, Devil Eye, Atomic, Psycho, Godfather, OG and Devil Eye |
| 05/22/13: | SAPD, 10 grams of Klimax |
| 6/6/13: | CS, 1 3-gram package Venom "7 Aces" 3, and 1 3-gram package Diablo Botanical |
| 06/07/13: | SAPD, 3 gra,s of Klimax |

**Hang Ten** (11421 West Avenue, San Antonio, Texas),

owned by **Muhammed JAFFER ALI** and **Ashekul MOWLA**;

| | |
|---|---|
| 10/16/12: | DEA, 15 grams of iBlown (lab results indicate the presence of5FUR-144) |
| 10/16/12: | DEA, 11 grams of KUSH (lab results indicate the presence of UR-144) |
| 05/22/13: | SAPD, 3 grams of Titanic |
| 06/07/13: | SAPD Diablo 3g |

**Smokers Galaxy** (8525 Perrin Beitel, San Antonio, Texas),

owned by **Syed ALI** and A.R.K.;

| | |
|---|---|
| 07/27/12: | DEA, 1 gram of Disco Multi-Purpose Solution 1g (lab results indicate the presence of alpha-Pyrrolidinopentiophenone hydrochloride) |
| 08/10/12: | DEA, 11 grams of grape-flavored KUSH |
| 06/07/13: | SAPD, 1.5 grams of Happy Days |
| 06/13/13: | DEA, 3 grams of Green Zombie Chronic Hypnotic |

67

**Gloria Food Mart** (703 W. Rhapsody, San Antonio, Texas),
owned/operated by Gulzar DHARANI a.k.a. Gloria;

10/16/12:    DEA, 1000 milligrams of Eight Ball Concentrated Glass Cleaner, 250 milligrams of Tran Quility, 500 milligrams of White Angel Stain Remover, Fire Ant Killer;

11/13/12:    DEA, 1 glass jar of Fire Ant Killer

05/31/13:    DEA, 2 3-gram packages of Klimax;

06/05/13:    DEA 2 3-gram packages of Klimax and one 10-gram package of Klimax;

06/05/13:    DEA, 1 250-milligram jar of Happy Land concentrated plant nutrient, 1 250-milligram jar of Tran Quility concentrated plant nutrient;

**Hildebrand Grocery** (1502 Hildebrand, San Antonio, Texas),

owned by **Gulzar DHARANI a.k.a. Gloria;**

05/31/13:    DEA, 3 grams of Klimax;

(DHARANI has been in India visiting family since June 15th, however, she was intercepted on Saturday, June 22, 2013, placing an order from India with MOWLA for 100 mix/match (Mango, Bubble Gum, Strawberry) to be delivered to Hildebrand Grocery immediately)

**Ray Bon Grocery** (7031 Ray Bon, San Antonio, Texas),

owned/operated by **Gulzar DHARANI a.k.a. Gloria;**

06/05/13:    DEA, 3 grams of Klimax;

**Anam Food Mart** (530 S. General McMullen, San Antonio, Texas),

owned/operated by Gulzar DHARANI a.k.a. Gloria;

06/12/13:    SAPD, 10 grams of Klimax;

**Stanley's Ice House** (6414 Wurzbach, San Antonio, Texas),

owned/operated by **Gulzar DHARANI a.k.a. Gloria;**

05/13/13:    DEA, 3 grams of Klimax;

06/05/12:    DEA, 11 grams of KUSH;

06/07/13:    SAPD, 3 grams of Klimax;

**Fort Sam Grocery** (2111 Harry Wurzbach, San Antonio, Texas),

owned/operated by **Gulzar DHARANI a.k.a. Gloria;**

06/13/13:    DEA, 10 grams of Klimax strawberry 2XX;

**Fast Stop** (3604 Commercial Avenue, San Antonio, Texas),

**MOWLA** was surveilled to this location where he supplied suspected synthetic

marijuana products for further distribution

05/22/13:    SAPD, 3 grams of Klimax;

06/12/13:    SAPD, 10 grams of Klimax;

### THE STORAGE CENTER, Unit 1002

144.    On April 2, 2013, agents received information concerning the attempted delivery of

3 pallets containing 20 50-pound bags (1,000 pounds total) of a substance later identified as

damiana.    Damiana is finely cut plant material used in the production of cannabinoids (synthetic

marijuana) which is grown in such places as Mexico and South America.    On March 29, 2013,

the company was unsuccessful in making delivery of the damiana to unit #1002 at The Storage

Center located at 16939 Nacogdoches San Antonio, Texas.    The shipping information obtained

by DEA indicated that the damiana was shipped by A Herb CO, 4501 E. Washington BLVD, Los

Angeles, CA 90040 and the consignee was listed as Damiana Trade, 16939 Nacogdoches, San

69

Antonio, Texas. DEA was also notified that a previous shipment of 40 50-pound bags of damiana (2,000 pounds total) had been successfully delivered to this location approximately two weeks prior to the same storage unit.

145. On April 2, 2013, a DEA administrative subpoena was served on The Storage Center for information regarding the renter of unit 1002. Management advised that storage unit 1002 was rented on February 1, 2013, by A.S. of 414 E. Aviation BLVD #21 Universal City, Texas. Officers were also advised that a person stating to be A.S. sister, S.C., had rented unit 1030. On this date, DEA observed a Middle Eastern male, later identified by DEA as **Amir SENADA** inside storage unit 1002. The manager also advised that **SENADA** had previously come into the office of the storage center and rented storage unit 1011 advising the manager to put the unit under the same renter as unit 1002. Management advised that several individuals other than A.S., S.C., and **SENADA** were accessing the storage units and that numerous packages were being delivered to storage unit 1002 via FedEx and DHL shipping companies. Some of these packages seen by DEA contained shipping labels from Hong Kong and China. China is the primary source country for the chemicals used in the synthetic marijuana manufacturing process.

146. On June 4, 2013, DEA was notified by the manager of The Storage Center that S.C. had cancelled unit 1011 and unit 1030. On this date DEA observed **Ashak WESA a.k.a. Antonio** engage in conversation with management. DEA was advised that **WESA** asked management to place any shipping boxes received into unit 1002.

147. On June 6, 2013, DEA was notified by management at The Storage Center that four FedEx packages for unit 1002 had arrived. DEA arrived at The Storage Center and inspected the shipped boxes. The boxes were addressed to "Julia WESSAK" from a Postal Center Plus in

Newark, NJ. The telephone number associated with WESSAK at the unit was listed on the FedEx label as (305)834-9451. Investigation has confirmed this number is utilized by **WESA**.

148. On June 12, 2013, DEA was notified by management at The Storage Center that an Express Mail Service (EMS) envelope for unit 1002 had arrived. DEA arrived at The Storage Center and inspected the envelope. The envelope was addressed to "Julia" and was shipped from Shanghai Keeps Trading CO., INC, Shanghai, China. China is a source of supply for chemicals as well as packaging used to make and distribute synthetic marijuana.

149. On June 13, 2013, DEA was notified by The Storage Center that a FedEx Box for unit 1002 had arrived. DEA arrived at The Storage Center and inspected the box. The box was addressed to "Michael David," a name seen on other shipments to this organization. A flammable liquid placard was displayed and the word "16 liters" was hand written on the side of the box. The box was shipped by Tasty Puff of Albuquerque, NM.

150. On this same date, The Storage Center management notified DEA that a Middle Eastern male, identified as **SENADA**, driving a white Toyota had arrived and retrieved the Tasty Puff box and told management that he had been "tracking" this package. Later in the afternoon DEA observed **SENADA** travel to The Storage Center in a 2012 white Toyota rental car and enter and park by unit 1002. **SENADA** was observed by DEA entering the unit and retrieving two cardboard boxes and placing them in the trunk of the vehicle.

151. Over the course of the past two months, DEA has observed and identified numerous associates of the **JAFFER ALI/MOWLA** organization entering the above-named storage units and offloading and loading various sized boxes and what appear to be damiana bags into and out of the units at The Storage Center. DEA had also observed these subjects transport

71

the bags and boxes to 18811 FM 2252, San Antonio, Texas. This location was a warehouse with two overhead doors with a loading dock and office door. The building was located in a small business park at the end of a private road behind a body shop and restaurant. Affiant believes that this was used as a synthetic marijuana manufacturing and distribution site. DEA had also seen **WESA, SENADA, S.C.,** and A.S. at this FM 2252 location.

152. DEA has also observed boxes transported from the FM 2252 warehouse site that were later seized by law enforcement and which contained finished synthetic marijuana packets. Such an occasion was on April 2, 2013, when a Suzuki SUV bearing Texas license plate DS9 D181 (registered to **Irma ZERTUCHE-Santillan,** 319 Beal Street, San Antonio, Texas) was surveilled leaving the FM 2252 site and subsequently traffic stopped on IH-10 for following too close to a tractor trailer in unsafe weather conditions. **ZERTUCHE-Santillan** was identified as the driver and B.C. was her passenger. **ZERTUCHE-Santillan** consented to a search of her vehicle, which resulted in the seizure of approximately 5,650 packages of synthetic marijuana. **ZERTUCHE-Santillan** told the officer conducting the traffic stop that she had received the merchandise from an unknown male at a Chevron gas station in San Antonio at the intersection of Callaghan and I-410. Based on surveillance observations, agents are aware that **ZERTUCHE-Santillan** was not being truthful in her answers. **ZERTUCHE-Santillan** and B.C. were released from the seizure site.

153. On April 8, 2013, DEA also seized evidence recovered from a trash site where discarded items from the FM 2252 side were placed by S.C. and an unknown male associate. These discarded items included foil packages, damiana, receipts from deliveries, lists of workers

72

and amounts each had packaged of the finished synthetic marijuana foil packages, empty "Tasty Puff" brand containers used to flavor the chemically treated damiana.

### Judson Storage, Units 2303 and 2326

154.   On April 2, 2013, during surveillance of the below referenced warehouse location, agents observed **SENADA** depart the site and travel to Judson Storage located at 14989 Judson Rd., San Antonio, Texas.    **SENADA** parked next to a storage unit, later identified as storage unit 2303.   **SENADA** was seen inside the storage unit that contained numerous large cardboard boxes.   On April 3, 2013, records were obtained which indicated that on March 12, 2013, A.S. rented unit 2303 (10x20).   S.C. was listed on the application as having "access rights" to unit 2303.   A.S. listed her employer as "Best Foods."

155.   On April 17, 2013, a DEA Administrative Subpoena was served on management at Judson Storage, which revealed that on April 6, 2013, S.C. had rented storage unit #2326 and unit #3482.   A.S. was listed as a person having access to the storage units.   DEA was advised by management of Judson Storage that a Middle Eastern male, later identified by management and DEA as **Amir SENADA**, had been seen in unit #2303.    Management advised DEA that DHL attempted to deliver packages to the units rented under A.S.'s and S.C.'s name, but had a strong odor and were refused delivery.

156.   On June 5, 2013, DEA was notified by management that unit 3482 did not have a lock on it and when opened by management was completely empty.   On June 6, 2013, DEA was notified by management that S.C. was seen in unit 2326.   S.C. came to the management office and paid cash for the June storage rental fees, paying $140.00 for unit 2303, $51.20 as a pro-rated amount to vacate unit 3482, and $140.00 for unit 2326.

157.    On June 22, 2013, DEA made contact with management at Judson Storage and inquired as to entry activity by S.C. or subjects associated with units 2303 and 2326.   Entry and exit thru the gated area requires entering a unique combination of an entry code and the unit number.   Management checked the computer database for unit 2303 and advised that an entry date of June 19, 2013 at 5:00 p.m, had been recorded for unit 2303.   Management also checked the computer database for unit 2326 and advised that an entry date of June 17, 2013 at 10:00 a.m., had been recorded for unit 2326.   Management also advised seeing a Cargo van, silver Honda, and a U-Haul rental van at the units on several occasions in the recent weeks.

### Covey's Happy Mini Storage, units A-28, F-09, I-17, J-18, J-22, J-24, J-26, J-28 and J-30

158.    On May 3, 2013, agents observed a Ford Expedition, a U-Haul truck and a silver Chevrolet Malibu depart the suspected laboratory site located at 18811 FM 2252, San Antonio, TX.   All three vehicles drove in tandem to The Storage Center located at 16939 Nacogdoches San Antonio, Texas.   These vehicles were driven by S.C., a Hispanic male identified by DEA as M.A., and a third unidentified Hispanic male.   They were observed by DEA loading numerous boxes from the warehouse site and The Storage Center into vehicles and then observed off-loading the boxes into several storage units at Covey's Happy Mini Storage located at 999 FM 1518 Schertz, Texas.   Over the course of several trips to Covey's Happy Mini Storage, DEA observed many boxes being placed into several storage units.   Some of the boxes were open and could be seen to contain many foil packages of finished synthetic marijuana packages inside large zip lock bags similar to those previously seized by law enforcement.

74

159. On May 10, 2013, a DEA administrative subpoena was served on management of Covey's Happy Mini Storage. Management advised DEA that S.C. rented storage units A-28, F-9, I-17, J-35 and J-36 on April 24, 2013 and May 2, 2013. The rental contract was in the name A.S.

160. On May 13, 2013, DEA was advised by management at Covey's Happy Mini Storage that S.C. and an unidentified Middle Eastern Male rented an additional 300 square feet of storage space under the name A.S. by vacating smaller units and acquiring larger ones. The Middle Eastern male requested Covey's Happy Mini Storage take delivery of DHL packages. S.C. completed the form for package deliveries and listed her address as 414 Aviation #19, Universal City, Texas and a phone number of 210-371-3651. The storage units listed under A.S. name were identified as A-28, F-09, I-17, J-18, J-24, J-26, J-28, and J-30. DEA observed targets driving to this location and entering several of the above storage units on a number of occasions at various times of the day and evening.

161. On June 11, 2013, DEA was advised by Covey's Happy Mini Storage management that on May 27, 2013, S.C. added storage unit J-22(10X10) to A.S.'s rental contact.

162. In June 2013, FBI intelligence information received by DEA and surveillance operations conducted by DEA revealed that members of the **JAFFER ALI/MOWLA** organization were relocating stored items used in the production of synthetic marijuana from storage facilities and closing the synthetic marijuana manufacturing and distribution site at 18811 FM 2252. On the evening of June 2, 2013, DEA observed S.C. depart in a U-Haul van followed by a red mustang (mentioned in the following paragraphs) from the synthetic marijuana manufacturing and distribution site at 18811 FM 2252 and arrive at Covey's Happy Mini Storage.

DEA was unable to observe whether boxes were offloaded or loaded onto the U-Haul from the units due to the time of night. The U-Haul departed approximately 15 minutes later before returning to the manufacturing and distribution site. On June 4, 2013, DEA surveillance was conducted on members of this drug organization. M.A. and an unidentified Hispanic male were observed departing The Storage Center in a Penske truck after loading unknown boxes from storage units 1002 and 1011. DEA observed the truck arrive at Covey's Happy Mini Storage where M.A. and the Hispanic male were observed loading boxes from two different units into the Penske truck. The truck departed then area and returned to The Storage Center. On June 18, 2013, a Middle Eastern Male identified as M.S.M. and an unidentified female were observed by DEA departing 6627 Topper Run, Suite #102, San Antonio, TX, which appears to be a new manufacturing and distribution site and which is further described in the paragraphs that follow. M.S.M. drove in white Chevrolet van and traveled to Covey's Happy Mini Storage, where M.S.M. and the female were observed opening and entering several different storage units related to the above. They loaded several boxes from one of the units into the van and returned to the Topper Run site.

163. On June 21, 2013, DEA met with Covey's Happy Mini Storage management to confirm the storage units rented by S.C. and obtain any entry activity by S.C. and associates. Management confirmed that all nine (9) storage units are still rented to A.S. and S.C. and that an entry/exit computer check had recorded an entry into the gated area under for one of the storage units on June 20, 2013, at approximately 3:27 p.m.

76

## Public Storage, 14815 Jones Malsberger, Unit 262

164. On June 2, 2013, DEA conducted surveillance operation of S.C. at the location where S.C. is believed to be living. S.C. departed the location in a previously identified U-Haul van. S.C. traveled to 18811 FM 2252 San Antonio, Texas, the site of the suspected synthetic marijuana manufacturing and distribution site. S.C. was followed by a previously red Ford Mustang driven by T.L., who DEA had seen at the manufacturing site in this vehicle on previous occasions. T.L. was accompanied by an unidentified female passenger. S.C. backed the van to the warehouse bay door. A short time later, S.C. departed in the U-Haul van and drove to Wal-Mart, where she purchased padlocks and black trash bags. S.C. then departed Wal-Mart and arrived back at the FM 2252 site. S.C. then departed site followed by the Ford Mustang. Both vehicle drove in tandem and arrived at Public Storage, located at 14815 Jones Maltsberger, San Antonio, TX.

165. After arriving at the business, S.C. walked inside the office of Public Storage. After talking with management, S.C. entered the drove the U-Haul van inside the gated area of storage units. DEA was observed S.C., T.L., and the unknown female unloaded numerous black trash bags containing suspected damiana, large plastic tarps, and what appeared to be equipment to be used in sealing or stamping the synthetic marijuana foil packages prior to distribution. Both vehicles returned to the FM 2252 site and then made a second trip to Public Storage.

166. A DEA Administrative Subpoena served on Public Storage on June 6, 2013, revealed that S.C. had rented storage unit 262 on June 2, 2013. A printout of entry and exit information indicated two entries on June 2, 2013, and one entry on June 5, 2013, for a total time

of approximately 10 minutes each. DEA has not observed S.C. or associates travel to this facility since the items were placed in unit 262 on June 2, 2013. On June 22, 2013, DEA contacted management at Public Storage and inquired as to any recent entry activity by S.C. or subjects associated with unit 262. Management advised DEA that according to a computer check over the past 10 days, there have been no entries for this unit. An entry and exit code and unit number is required to enter and exit the facility. DEA believes that items necessary in the processing stage of synthetic marijuana distribution are still secured in this location.

### PIONEER Stor & Lok, 9415 N IH-35, Units 16 & 17

167. On June 4, 2013, DEA surveillance was conducted on members of this drug organization. S.C. and M.A. and an unknown male were observed at The Storage Center in the area near units 1030 and 1011. Over the course of several trips, what appeared to be damiana bags were removed from both storage units via a Penske Truck and a Ford Expedition. The vehicles traveled together to the Texas Best Self Storage Center located at 16002 Nacogdoches San Antonio, Texas. S.C., M.A., and the male then removed what appeared to be damiana bags and various size boxes from two units. DEA had previously identified this storage facility during surveillance of **SENADA** and **WESA**, who were observed removing boxes with flammable markings on them and what appeared to be bags of damiana and finished synthetic marijuana packages from the units.

168. A DEA Administrative Subpoena served on Texas Best Storage on April 3, 2013, revealed four (4) storage units had been rented by A.S. and S.C. Management advised that packages are delivered by shipping companies on a regular basis addressed to A.S. and S.C.'s first names and "BEST FOOD". DEA has seen many of the packages that were shipped from such

78

places as Hong Kong and China. DEA observed one box containing new, unfilled foil packages through torn areas of the box and seam. One of the packages that were visible from a broken seam was labeled "Wolf Pack," which is a brand label of synthetic marijuana that DEA has seen in previous seizures. On June 8, 2013, DEA received information from management at Texas Best Self Storage, that all four units rented under the name A.S. and S.C., had been vacated.

169. On June 4, 2013, after the Damiana bags were loaded in the vehicles from Texas Best Storage Center, DEA observed S.C. (driving the Penske truck) and M.A. (driving the Ford Expedition with the unknown male passenger) depart Texas Best Self Storage and arrive at Pioneer Stor & Lok, located at 9415 North IH-35, San Antonio, TX. Both vehicles parked in front of the storage facility and S.C. made contact with an employee of the storage facility... DEA observed S.C. and the employee of the storage facility walk into the fenced area of the storage facility. DEA observed both vehicles pull into the secure area of the storage complex and park in front of a storage unit, where S.C. was observed opening unit #17. S.C., M.A. and an unknown male subject were observed unloading sacks of suspected damiana and unknown boxes.

170. DEA served an administrative Subpoena at this location on June 17, 2013, which revealed that S.C. rented storage unit 16 on June 3, 2013, and unit 17 was added to the original contract on June 4, 2013. Management advised DEA that S.C. stated that she was storing T-shirts and Tea Bags. Management also advised DEA on June 17, 2013, that tenants of other units complained of the smell coming from units 16 and 17 and that S.C. was informed by management that she would need to vacate the premises by the end of the month.

79

171. On June 17, 2013, DEA observed S.C. drive the previously identified Chevrolet cargo van and park near units 16 and 17. S.C. departed the area a short time later, but DEA lost her location due to heavy traffic.

### Public Storage, 13800 Nacogdoches Road, Unit 278

172. On the evening of June 4, 2013, DEA observed S.C. in a white 2013 Chevrolet cargo van with Texas temporary tag. S.C. traveled in the van to the 18811 FM 2252 site. S.C. departed the warehouse and DEA observed two (2) bundles of flat unused cardboard boxes thru the windows of the cargo area of the van. DEA had observed on several occasions boxes that were transported from the warehouse and later seized from FedEx, and which contained finished packages of synthetic marijuana shipped to non-existent addresses, fictitious names, and even shipped to motels in Texas and out of state. S.C. drove to Public Storage located at 13800 Nacogdoches Rd., San Antonio, Texas and entered the complex. DEA was unable to observe which unit S.C. entered.

173. On June 6, 2013, a DEA Administrative Subpoena served on Public Storage management revealed that S.C. had rented storage unit 278 on April 10, 2013. The alternate contact name listed on the rental agreement was A.S. A printout of entries dates show S.C. entered the facility three times on June 4, 2013, and there were multiple gate entries per day beginning April 10 thru the date of the printout on June 6, 2013. Affiant believes this is the unit S.C. drove to on June 4, 2013.

174. On June 22, 2013, DEA visited management at Public Storage and inquired as to entry activity by S.C. or subjects associated with unit 278. Management checked the computer database and advised that an entry date of June 21, 2013 at 4:38 p.m., had been recorded for unit

80

278 for a total time of approximately 10 minutes. Entry and exit thru the gated area requires entering a unique combination of an entry code and the unit number.

### Warehouse located at 6627 Topper Run, Suite 102, San Antonio, Texas

175. On June 6, 2013, DEA conducted surveillance at several known storage units identified as being used by this drug organization. During surveillance, DEA observed a Penske Truck, turning into The Storage Center located at 16939 Nacogdoches, San Antonio, TX. DEA observed the truck enter the front parking lot of The Storage Center and observed an older Hispanic male (subject #1) wearing a dark colored ball cap exit the truck. This Hispanic male has been seen during previous surveillances, but has not yet been identified. The driver of the Penske truck was wearing a white ball cap and identified by DEA as M.A. from previous surveillances. A third unidentified male (subject #3) was wearing a red ball cap and has been seen during previous surveillances, but has not been identified.

176. DEA observed the subject #1 and subject #3 enter a previously identified 2002 gold Saturn with silver parked in the parking lot of The Storage Center. Subject #1 entered the driver's seat of the Saturn and followed M.A., who was driving the Penske truck south on FM 2252 to east Loop 1604. A short time later, both vehicles arrived at the warehouse identified as 6627 Topper Run San Antonio, TX. The vehicles parked near suite "102" which was marked above the middle office door. DEA was unable to serve a DEA Administrative Subpoena because it is unknown who actually owns the entire building and to inquire could compromise the investigation. The complex is a self-contained structure comprised of three separate office doors and three separate bay doors. Each suite has a single bay door to the right of a single office door. There was no business name listed above the bay door or office doors marked "101" or

81

"102." The Penske truck driven by M.A. backed all the way to the warehouse middle bay door and to the right of the office door so that the doors of the Penske truck would not open. All three subjects then entered the Saturn and departed the area. S.C. arrived shortly thereafter in a previously identified 2013 white Chevrolet cargo van. S.C. parked on the passenger side of the Penske truck and remained in the vehicle for several minutes. DEA then observed S.C. exit the van and enter the Penske truck and remove what appeared to be a cellular phone charger or headphones. S.C. then returned to the van and departed the area. S.C. was observed by DEA travel to the Inn Town Suites located at 9530 Perrin Beitel San Antonio, TX.

177. Between June 12, and June 17, 2013, DEA observed the following activity at what DEA believes to be the new synthetic marijuana manufacturing and distribution site. DEA observed the Chevrolet van driven by S.C. and the previously identified red mustang parked in front of the bay door to suite 102. A Toyota Camry rental car identified by DEA as being driven by **Amir SENADA** arrived in front of suite 102. DEA also observed two unidentified workers (one male and one female) exit the office door of suite 102 wearing aprons and start smoking. DEA believes these are paid workers who packaging synthetic marijuana inside the warehouse of suite 102. DEA believes the workers are wearing aprons to minimize the contact of the synthetic marijuana to clothing and skin due to the chemicals and flavoring sprayed on the Damiana plant material. DEA is aware that some of the chemicals used in the manufacturing process are flammable and therefore, workers would come outside to smoke. During surveillance by DEA at the previous warehouse manufacturing site, workers were seen standing outside the office door smoking.

178. On June 18, 2013, DEA conducted surveillance of 6627 Topper Run, Suite 102, San Antonio, TX. During surveillance operations, DEA observed several vehicles parked in front of the Suite 102. One of the vehicles was a red Ford Mustang seen in previous surveillances by DEA at both storage facilities and the prior manufacturing and distribution site located at 18811 FM 2252, San Antonio, Texas. On this date, DEA observed T.L. and a previously observed unidentified female exit the office door to the new warehouse site and enter the Ford Mustang. Also observed this date was the previously identified white Ford Expedition parked in front of the lab. DEA observed the driver of the Ford Expedition, M.A., exit the office door to the warehouse and enter the Ford Expedition. M.A. has been seen numerous times at the previous manufacturing site and storage facilities moving boxes. Also seen by DEA was **Amir SENADA**, who was observed at the warehouse with his previously identified silver Honda (registered in his name) parked in front. DEA observed **SENADA** enter the trunk of his vehicle and removed two large clear zip lock bags of what appeared to be synthetic marijuana packages of unknown brands. **SENADA** walked into the office door of the warehouse with these packages.

179. During surveillance on this date, DEA observed several unknown subjects entering and exiting the office door and often times seen leaving the door open. One male subject was observed brushing off his clothing and hair. DEA believes this subject was attempting to remove damiana plant material from his clothing DEA observed items inside the office area of the warehouse where large boxes could be seen stacked on top of each other along with large plastic storage bins. Also observed were several one gallon sized plastic bottles on top of a table containing an unknown yellow liquid.

180.    During surveillance at the Topper Run warehouse on June 18, 2013, DEA observed a green Honda registered to M.S.M.  M.S.M. and an unidentified female were observed departing the warehouse in a white Chevrolet van and traveling to Covey's Happy Mini Storage located at 999 FM 1518 Schertz, TX, where M.S.M. and the female entered several different storage units mentioned in previous paragraphs.  They several boxes from one of the units into the Chevrolet van and departing back to the Topper Run address.  M.S.M. and the female were observed by DEA as they removed items from the white Chevrolet van and place them inside the warehouse office area.  M.S.M. and the female were then observed by DEA as they traveled to the previous laboratory site at 18811 FM 2252, San Antonio, Texas.  M.S.M. and the female then entered the warehouse door and were seen making multiple trips to the van carrying items such as folded card board boxes and plastic storage bins.  M.S.M. and the female then returned to the warehouse site on Topper Run and offloaded these items into the office area.  Later this date, M.S.M. and the female passenger departed the warehouse and drove to Hang Ten Gifts and Novelties located at 11421 West Avenue, San Antonio, TX.  M.S.M. was identified removing a large box from the van and entering the store.  M.S.M. departed empty handed and departed the area.  Observed in front of the store was a silver Toyota 4-Runner, previously identified as being registered to **Ashekul MOWLA**.  **MOWLA** has been seen on multiple surveillances by DEA and FBI in this vehicle and is part owner of this store where several undercover purchase of synthetic marijuana has been made.

84

181. In light of the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of such criminal offenses may be located at the SUBJECT PREMISES described in Attachment A,

I believe that there is probable cause to believe that **Muhammad JAFFER ALI, Ashekul MOWLA, Ashak WESA a.k.a. Antonio, David B. PUCEK, Dung NGUYEN a.k.a. Alex, Brian ARTHUR, R. DAN ARTHUR, Joshua Louis HASNESS, Amir Nabil Shaker SENADA a.k.a. Sam, Salma JAFFER ALI, Faizan ALI, Luz Abril GARCIA, Irma SERUCHE-Santillan a.k.a. Natalie or Nathly, Gulzar DHARANI a.k.a. Gloria, Abu Mohammad Mafttah UDDIN a.k.a. Paul, Syed ALI, Yong CHONG a.k.a. Sam, Derrick SANTILLAN, Prasanta BARDHAN**, and others known and unknownhave violated, and are likely continuing to violate: *(a) distribution of and possession with intent to distribute controlled substances and controlled substances analogues, cannabinoids, also known as synthetic marijuana and substituted cathinones, also known as bath salts, all of which are set forth in Sections 802(32),802(34), and 813 of Title 21; (b) attempts and conspiracies to do the same, all in violation of Sections 841(a)(1) and 846 of Title 21, United States Code; (c) importation of controlled substances and controlled substances analogues, cannabinoids andsubstituted cathinones into the United States, all in violation of Section 960 of Title 21, United States Code; (d) attempts and conspiracies to do the same, all in violation of Sections 952(a) and 963 of Title 21, United States Code; (e) use of wire facilities to facilitate the commission of the offenses described in subparagraphs (a), (b), (c) and (d) above, in violation of Title 21, United States Code, Section 843(b); (f) money laundering and conspiracies to do the same, in violation of Title 18, United States Code, Section 1956 and 1957; (g) structuring transactions to evade reporting*

85

*requirements, in violation of Title 31, United States Code, Section 5324; and (h) aiding and abetting the offenses described in subparagraphs (a), (c) and (f) above, in violation of Title 18, United States Code, Section 2.*

Adebowale Alade, Special Agent
Federal Bureau of Investigation

Sworn to and Subscribed before me on this _____ day of June, 2013.

John W. Primomo
United States Magistrate Judge

86

R

AO 442 (Rev. 01/09) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

**Western District of Texas**

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Muhammad JAFFER-ALI (1) | ) | Case No.  5:13-MJ-578 |
| | ) | |
| *Defendant* | ) | |

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*   __Muhammad JAFFER ALI__
who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment        ☐ Superseding Indictment        ☐ Information        ☐ Superseding Information        ☑ Complaint
☐ Probation Violation Petition        ☐ Supervised Release Violation Petition        ☐ Violation Notice        ☐ Order of the Court

This offense is briefly described as follows:

21 U.S.C. 846 and 841(a), Conspiracy to Manufacture, Distribute, and Possess with Intent to Distribute a Controlled
Substance and Controlled Substance Analogue

Date:  6/26/13

_____
*Issuing officer's signature*

City and state:     San Antonio, Texas

_____
*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____<br>at *(city and state)*  _____ . |
| Date: _____                                    _____<br> *Arresting officer's signature* <br><br> _____<br> *Printed name and title* |

*FBI*

AO 442 (Rev. 01/09) Arrest Warrant

*R*

# UNITED STATES DISTRICT COURT

for the

Western District of Texas

United States of America
v.
Brian ARTHUR (6)

)
)
)
)
)

Case No.   5:13-MJ-578

*Defendant*

## ARREST WARRANT

To:   Any authorized law enforcement officer

YOU ARE COMMANDED to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*   Brian ARTHUR

who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment   ☐ Superseding Indictment   ☐ Information   ☐ Superseding Information   ☑ Complaint
☐ Probation Violation Petition   ☐ Supervised Release Violation Petition   ☐ Violation Notice   ☐ Order of the Court

This offense is briefly described as follows:

21 U.S.C. 846 and 841(a), Conspiracy to Manufacture, Distribute, and Possess with Intent to Distribute a Controlled
Substance and Controlled Substance Analogue

Date:  6/26/13

City and state:   San Antonio, Texas

_____
*Issuing officer's signature*

_____
*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date:  _____ |
| _____ *Arresting officer's signature* |
| _____ *Printed name and title* |